[Crim. No. 12063.   Second Dist., Div. Five.   Mar. 21, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. SAMMY LISNER, Defendant and Appellant.

Russell E. Parsons and Edward I. Gritz for Defendant and Appellant.

Thomas C. Lynch, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Plaintiff and Respondent.

HUFSTEDLER, J.—Lisner was convicted of receiving stolen property in violation of section 496 of the Penal Code upon an information charging Lisner with receiving 34 cases of stolen liquor worth $2,170, knowing that the property had been stolen, and with concealing and withholding the property from the owner, Sterling Liquor Company, Inc. Lisner's motion under section 995 of the Penal Code was denied. He pleaded not guilty, and trial by jury was waived. All counsel stipulated that the cause would be submitted on the testimony contained in the transcript of the preliminary hearing, subject to the court's rulings and the right of each side to offer additional evidence. At the time of trial the People offered additional testimony by George H. Weiner and by Charles

Flygare. Defendant testified in his own behalf. Lisner was found guilty as charged, proceedings were suspended, and he was given three years' probation, as a condition of which he was ordered to pay a fine of $500, plus penalty assessment, and to make restitution. Lisner appealed from the "judgment and order granting probation."[1]

Lisner contends that he was convicted upon evidence obtained as a result of an illegal search and that evidence of his admissions was improperly received because he had not been advised of his constitutional rights before his statements were made.

### Summary of the Evidence

On March 3, 1965, Charles Flygare, an employee of Sterling Liquor distributors, hauled away 200 cases of his employer's liquor without his employer's consent. Two days later Flygare met Lisner at the Roma Inn, a bar and restaurant owned by Lisner's sister, by whom Lisner was apparently employed. Flygare asked Lisner if he would be interested in buying some part of the liquor. Lisner "asked how hot it was" and Flygare replied "it wasn't too hot." Flygare showed Lisner liquor invoices for the liquor he was attempting to sell, which invoices were made out to about 34 different licensees. Lisner's sister, the licensee for Roma Inn, was not among them. Lisner told Flygare that he would be "interested in the vodka and actually most anything at a right price." The two men dickered over the price and ultimately agreed upon a price of $700 for the purchase of 25 cases of Fleishmann's vodka, 5 cases of Sonya vodka, and 4 cases of Fleishmann Select Bourbon. The approximate wholesale value of that liquor was $1,100. Flygare delivered the liquor to Lisner at the Roma Inn and Lisner paid Flygare the $700 purchase price in cash about midnight on March 5, 1965. Lisner knew that the price was substantially below the market value, but he testified that he attributed the reduced price to a representation that the source of the liquor was someone who was going out of business and that he did not know it was stolen.

Officer Donald Zellers, of the Los Angeles Police Department, had received information that there was stolen liquor at the Roma Inn. He called George Weiner, special agent for the State Alcoholic Beverage Control, told him what he knew of the case, and the two men arranged to go to the Roma Inn with Lieutenant William Carter and with Flygare, who was

---

[1]The order granting probation is deemed a final judgment of conviction for the purpose of appeal. Pen. Code, § 1237.

in custody. The four men went to the Roma Inn on March 19. While Carter and Flygare waited in the parking lot, Weiner and Zellers went into the bar about 11:30 a.m. and met Lisner. Weiner showed Lisner his identification as agent for the Alcoholic Beverage Control, told Lisner that he was conducting an investigation and that he wanted to search the premises. He introduced Officer Zellers as "Don Zellers" but he did not tell Lisner that Zellers was a police officer. Zellers and Weiner asked Lisner if they could inspect the back bar, and Lisner readily agreed. Weiner asked Lisner if he would show them the paper work covering the purchase of the liquor on the premises. Lisner told him that no invoices were retained at the Roma Inn, because all of the papers had been turned over to accountants. After looking behind the bar, Weiner told Lisner that he wanted to search the room where supplies were kept. Lisner took a key from a key chain and opened the door to a small room containing about ten loose cases of assorted liquor and ten cases in boxes. Zellers told Lisner that he had been informed that Lisner had bought 34 cases of different types of alcoholic beverages from Flygare for $700 cash on the 5th of March. After looking at the liquor in the storeroom Zellers said to Lisner: "Sam, these are two of the cases that Flygare sold you." Zellers told Lisner that he was interested in recovering "the other 32 cases." Lisner thereupon said to Zellers, "Can I speak to you by myself?" Zellers said, "Yes," and the following exchange took place between Lisner and Zellers outside the presence of Weiner: Lisner said, "Who is your boss?" and Zellers replied, "I am my boss." Lisner said, "I can do you some good." Zellers replied, "You can not do me any good . . . Sam, I am interested in recovering the 32 cases of liquor, where are they?" Lisner said, "I got rid of them." Zellers asked, "Do you have it stashed?" and he replied, "I have 23 cases of it stashed." Weiner came into the room, along with Lieutenant Carter and Flygare, to whom Zellers related the conversation he had with Lisner.

Zellers testified that he advised Lisner prior to any conversation with Lisner that "he had a right to have an attorney present at all stages of the proceedings and that he had a right to remain silent and that anything he said could be used later in court." Weiner, however, testified that Lisner was not advised of his constitutional rights before their first conversation with him, but that he was advised at some later, unspecified time during their visit with Lisner at the bar.

Lisner testified that he was not advised of his constitutional rights at any time.

Lisner was placed under arrest and taken to the police station by Zellers. During the trip to the station Lisner gave Zellers repeated assurance that he would get the other 32 cases of liquor for him. Neither the arrest nor the search of the Roma Inn premises was made pursuant to a warrant.

Lisner contends that his incriminatory statements made to Zellers and Weiner were the fruit of an illegal search and thus inadmissible. (*Wong Sun* v. *United States* (1963) 371 U.S. 471, 475 [9 L.Ed.2d 441, 83 S.Ct. 407]; *People* v. *Stoner* (1967) 65 Cal.2d 595, 598-599 [55 Cal.Rptr. 897, 422 P.2d 585].) The search was illegal, he says, because Zellers and Weiner obtained entry to the premises and Lisner's consent to the subsequent search by deception : Lisner was led to believe that Zellers was an employee of the Alcoholic Beverage Control Department conducting an investigation with Weiner upon behalf of that department when, in fact, Zellers was a police officer and the purpose of the investigation was to locate stolen liquor.

■ Neither the entry nor the search was illegal. The premises which were searched were not a dwelling or a private place of business, but a public bar. Traffic in spiritous liquors, including the vending of liquor at public barrooms, has long been the subject of stringent public regulation. Conduct of law enforcement agencies, impermissible in respect of businesses standing higher in the public esteem, is often permitted in enforcing liquor laws. ''Where the evidence is sought by governmental officers, pursuant to a regulatory function, both the privilege against self-incrimination . . . and the guarantee against unreasonable search and seizure are limited.'' (Witkin, Cal. Evidence (2d ed. 1966) § 89, p. 83.)

■ The entry, the examination of the records of Roma Inn and the subsequent search of the premises were statutorily authorized by sections 25753 and 25755 of the Business and Professions Code, giving agents and local police officers wide powers to visit and to inspect the premises of liquor licensees.[2] The search was not illegal, with or without Lis-

---

[2] ''§ 25753. [Examination of books and records; inspection of premises.] The department may make any examination of the books and records of any licensee or other person and may visit and inspect the premises of any licensee it may deem necessary to perform its duties under this division.

''§ 25755. [Powers of peace officers; inspection of premises.] The director and the persons employed by the department for the administra-

ner's consent, unless Zellers and Weiner exceeded the statutory authority thus conferred, or Zellers and Weiner were guilty of fraud or deception so flagrant that the authority otherwise conferred by statute cannot immunize their activities.

The investigation conducted at the Roma Inn did not exceed the scope of authority conferred by sections 25753 and 25755. Those sections authorize inspection of licensees' premises not only by employees of the department but also by peace officers for the purpose of enforcing the Alcoholic Beverage Control Act. Both law enforcement agencies have a legitimate interest, reinforced by statute, in examining the premises of licensees for suspected violations of the penal statutes of California, particularly including potential illegal sales of contraband liquor. That legitimate interest is not impaired or destroyed because the discovery of contraband liquor may lead to an arrest of an employee of a licensee as well as to action by the department against a licensee. Nothing in the record suggests that Zellers and Weiner extended the search beyond that incident to enforcement of the alcoholic beverage control statutes.

There remains the question whether Zellers and Weiner so conducted themselves as to be chargeable with fraud, vitiating the authority given to the department and to peace officers to make a reasonable search of the licensee's premises. The only facts which remotely bear upon this contention are these: Zellers was not identified as a police officer but merely as a "new man," or simply "Don Zellers," from which it could have been inferred by Lisner that Zellers was an employee of the Alcoholic Beverage Control Department; neither Zellers nor Weiner disclosed to Lisner that the object of

tion and enforcement of this division have all the powers of peace officers in the enforcement of the penal provisions of this division, the rules of the department adopted under the provisions of this division, and any other penal provisions of law of this State prohibiting or regulating the sale, exposing for sale, use, possession, giving away, adulteration, dilution, misbranding, or mislabeling of alcoholic beverages or intoxicating liquors, and such persons have all the powers of peace officers in the enforcement of any penal provisions of law while they are in, on, or about any licensed premises in the course of their employment.

"The director, the persons employed by the department for the administration and enforcement of this division, *and local peace officers* may, in enforcing the provisions of this division, visit and inspect the premises of any licensee at any time during which the licensee is exercising the privileges authorized by his license on such premises." [Italics added.]

The Alcoholic Beverage Control Act was enacted pursuant to article XX, section 22 of the California Constitution.

their visit was to locate contraband liquor. These facts standing alone do not constitute fraud or such deception as will vitiate an otherwise legal entry and search. Lisner had no reason to suppose that Zellers and Weiner were paying a social call upon him. The announced purpose of the visit was to conduct an investigation. Neither Weiner nor Zellers had a duty to inform Lisner of the exact capacity of Zellers. These facts fall far short of bad faith on the part of Zellers and Weiner. Lisner must have known that when records were not produced to substantiate the inventory on the bar premises, the officers might well draw inferences not only adverse to the licensee but potentially adverse to himself.

■ Lisner's extrajudicial statements were not obtained in violation of the principles enunciated in *Escobedo* v. *Illinois* (1964) 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], and *People* v. *Dorado* (1965) 63 Cal.2d 338 [42 Cal.Rptr. 168, 398 P.2d 361].[3] Zellers testified unequivocally that, before any statements were elicited from Lisner, Zellers advised Lisner of his right to remain silent and his right to counsel. The trial court could have believed Zeller's testimony even though it was in some respects contradicted by the testimony of Weiner and of Lisner. It is elementary that the resolution of conflicts in the testimony is the function solely of the trial court with which this court cannot interfere. Zeller's warning adequately informed Lisner of his rights, and his declarations thereafter were admissible against him. (*E.g., People* v. *Luker* (1965) 63 Cal.2d 464, 473 [47 Cal.Rptr. 209, 407 P.2d 9] ; *People* v. *Garner* (1965) 234 Cal.App.2d 212, 219-220 [44 Cal.Rptr. 217].)

The judgment (order granting probation) is affirmed.

Kaus, P. J., and Stephens, J., concurred.

---

[3]The trial was commenced in this case on October 5, 1965. The expanded warning required by *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], does not apply to California cases tried before June 13, 1966. *People* v. *Rollins* (1967) 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].