[Crim. No. 19433. Second Dist., Div. Four. Feb. 10, 1972.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT DALE GREY, Defendant and Appellant.

COUNSEL

Richard H. Levin, under appointment by the Court of Appeal, for Defendant and Appellant.

Evelle J. Younger, Attorney General, William E. James, Assistant Attorney General, and Robert F. Katz, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

**KINGSLEY, J.**—Originally, defendant was charged in superior court case No. A-109191 with one count of theft and one count of receiving stolen

goods, both counts relating to a 1964 Chevrolet Chevelle, the property of Edward Taylor. In superior court case No. A-109664 he was similarly charged, in two counts, both relating to a 1968 Chevrolet Corvette, the property of Robert Arshan. Subsequently the two cases were consolidated, under the lower number, with the two counts of former A-109664 becoming counts III and IV of the consolidated information. Defendant's motions to dismiss the information under section 995 of the Penal Code, and his motion to suppress evidence under section 1538.5 of the Penal Code were denied; his motions to sever the consolidated information and his motion to dismiss the prosecution under section 1382 of the Penal Code were also denied. He pled not guilty. After a trial by jury he was found guilty on the two counts charging receiving stolen goods and not guilty of the theft charges. His motion for a new trial was denied; proceedings were suspended and he was given probation on certain conditions, including service of 100 days in the county jail. He has appealed; we affirm.

Because it is not (and could not be) contended that the evidence against him, if legally acquired and properly admitted, does not sustain the veridcts, we need, at this point, merely summarize the People's case:

Defendant, a man named James Brown (and perhaps a man named Dietrich) were engaged in stealing automobiles, stripping them, exchanging parts, repainting, and other conduct leading to the ultimate sale of the stolen cars or their parts. The police were first led to investigate the ring by the interrogation and arrest of Brown. Brown's statements, and papers found in Brown's possession, led to investigation of defendant and his arrest.

## I.

■ It is contended that the arrest of Brown was illegal and that that arrest contaminated all the subsequent investigation under the "fruit of the poisoned tree" doctrine. We conclude that the arrest of Brown and the interrogation that followed were legal.[1]

Late on the evening of March 5, 1969, police officers were directed to investigate a "cut-up" Mustang automobile at a given address, which it developed was Brown's home. On arrival, they found Brown about to drive away. His answers to their questions gave rise to the suspicion that he was not telling the truth. Inspection, at Brown's invitation, of cars on the

---

[1]That defendant has standing to object to any possible violation of Brown's constitutional rights is the law of California, even after the adoption of Evidence Code section 351, is settled by *Kaplan v. Superior Court* (1971) 6 Cal.3d 150 [98 Cal.Rptr. 649, 491 P.2d 1].

premises and a radio report on license numbers, clearly gave the officers reasonable grounds to arrest him for car theft. Nothing in the record suggests that the pre-arrest interrogation was other than investigatory, nor that Brown's constitutional rights were infringed.

## II

During the interrogation of Brown, he resorted to a briefcase, from which he removed sundry papers in an attempt to explain his connection with the cars found at his home. When Brown opened the briefcase, the officers were able to see that it contained other papers and license plates. When Brown was booked at the jail, the officers (as part of the booking process) opened the briefcase and inventoried its contents. Among other things, they thus found a document which led to the discovery of the theft of the 1968 Chevrolet involved in counts III and IV and to the connection of both Brown and defendant with that theft.

The arrest and search took place prior to the decision in *Chimel*. Even if we assume (as defendant suggests) that search of the briefcase—as distinguished from a search of Brown's person and clothing—was not a legitimate part of the booking process,[2] the officers were entitled to believe, from what they had seen earlier, that the briefcase contained (as it in fact did) Brown's records relating to his business of stolen cars. Under those circumstances, the search of the briefcase was, under pre-*Chimel* law, a search incident to the arrest.

## III

As above indicated, papers found in Brown's briefcase led the officers to investigate the theft of the 1968 Chevrolet and to suspect defendant's connection therewith. Pursuing that investigation, on June 11, 1969, Officer Sechrengost of the California Highway Patrol went to defendant's place of business, where defendant and Dietrich conducted the business of repairing and dealing in used cars. The officer first sought from defendant's landlord (Doig) permission to search the premises and received a somewhat equivocal permission. He then demanded similar permission from Dietrich, basing his demand on the provisions of section 2805 of the Vehicle Code, as that section then read.[3] Dietrich consented, but over the objection of defendant. The search disclosed evidence material to the People's case.

---

[2] We do not intend to infer that this suggestion is correct or that a similar search after *Chimel* would not be lawful.

[3] Section 2805: "A member of the California Highway Patrol may inspect any vehicle of a type required to be registered under this code on a highway or in any public garage, repair shop, parking lot, used car lot, or other similar establishment, for the purpose of locating stolen vehicles or investigating the title and registration thereof." The section was amended in 1970, but the amendment does not affect the constitutional issue.

■ Defendant claims that section 2805 was unconstitutional as violative of the Fourth Amendment.[4] We disagree. Defendant relied in the trial court, and relies here, on *Camara* v. *Municipal Court* (1967) 387 U.S. 523 [18 L.Ed.2d 930, 87 S.Ct. 1727] and on *See* v. *City of Seattle* (1967) 387 U.S. 541 [18 L.Ed.2d 943, 87 S.Ct. 1737]. While the argument is not without merit, we are not persuaded that it is valid in the case at bench. *Camara* concerned a warrantless search of a private residence in an effort to discover violations of the local building codes. *See* involved a routine search of all business establishments to ferret out possible violations of the fire safety laws. In neither case was the place involved of a kind differing from other residences and business establishments. In neither case does the record show any public interest in governmental searches that would set these places apart from other places in the same community. But it is a matter of which we may take judicial knowledge that, while most establishments engaged in repairing vehicles, dismantling vehicles or selling used vehicles are honestly conducted, that kind of business is frequently utilized as a "front" by persons engaged in the very kind of illegal business herein involved. Examination of the Vehicle Code discloses elaborate provisions for the registration and licensing of such businesses, designed to segregate the honest business man from the thief and the fence.[5] We think that this serves to distinguish the authority given by section 2805 from that purportedly given by the ordinances considered in *Camara* and *See*. To repeat, those ordinances were directed at *all* residences and at *all* business establishments, whether or not requiring any special permit or creating any special public danger; section 2805 (and its companion § 10656) are part of a statutory scheme directed at a special and well known evil. Absent some authority closer in point, we are inclined to hold that a state may impose on the licensing of a business, so fraught with public danger, a requirement that its premises be open to orderly inspections.[6]

---

[4]The Attorney General argues that the search was valid as being made with consent. As to that issue, we agree with defendant. The purported consent from the landlord (Doig) gave no right to enter into his tenant's premises (*Stoner* v. *California* (1964) 376 U.S. 483 [11 L.Ed.2d 856, 84 S.Ct. 889]); the assent given by defendant's partner (Dietrich) was equally immaterial. An apparent consent, given under the compulsion of, and in obedience to, an unlawful command is no defense to an entry and search otherwise unlawful. The case is analogous to *Bumper* v. *North Carolina* (1968) 391 U.S. 543 [20 L.Ed.2d 797, 88 S.Ct. 1788] where entry was secured under the supposed authority of a nonexistent search warrant. If section 2805 is valid, no consent was needed; if it was invalid, the consent was ineffective. Hence we reach the real issue discussed in the text.

[5]Consult, inter alia: Vehicle Code, sections 10650 et seq., 11500 et seq., 11701.

[6]Although decided prior to *Camara* and *See*, we regard the rationale of *People* v. *Lisner* (1967) 249 Cal.App.2d 637, 641-643 [57 Cal.Rptr. 674], sustaining the validity of sections 25753 and 25755 of the Business and Professions Code (permitting inspections of the premises of licensees under the Alcoholic Beverage Control Act), still to be viable.

## IV

■ As we note above, defendant originally was charged, by the two original counts in case number A-109191, with offenses relating to the 1964 Chevelle. That information was filed on August 21, 1969. Sundry continuances were granted, either at the request of, or with the consent of, defendant, until January 13, 1970. On that date, the prosecution, over the objection of defendant, consolidated the two counts from case number A-109664, which had theretofore been set for trial on February 27, 1970. The People represented that they were prepared to go to trial at once on the consolidated information; defendant represented that, although he was prepared to proceed on the two original counts of case number A-109191, he was not ready to proceed on the two other counts thus interjected into the case. As a result, and over defendant's objection to continuing the original counts, the entire case was continued until January 27, 1970. Thereafter other continuances resulted in the case finally coming on for trial on March 13, 1970.

Apart from the consolidation, the latest date on which the original information in case number A-109191 could have been tried was January 23, 1970.[7] Thus, unless the consolidation provided a "good cause" for the additional delay, the provisions of section 1382 of the Penal Code were violated.[8] But we think that defendant's contention is without merit on two grounds: (1) The consolidation quite clearly was proper on its merits, since the evidence concerning defendant's involvement in the two Chevrolets were so interwoven that it made a single trial a matter of time saving and of convenience for defendant as well as for the People. Since it was defendant who expressed an inability to proceed after the consolidation, we cannot say that the trial court erred in finding that there was "good cause" for the additional delay. (2) Where, as here, the section 1382 contention is raised on an appeal after judgment, defendant must show not only the delay and lack of good cause, but he must also show prejudice by the delay. (*People* v. *Wilson* (1963) 60 Cal.2d 139, 152 [32 Cal.Rptr. 44, 383 P.2d 452].) As we explained in *People* v. *Rodriguez* (1971) 15 Cal.App.3d 481, 484, footnote 2 [93 Cal.Rptr. 182], the language in *People* v. *Archerd* (1970) 3 Cal.3d 615, 640 [91 Cal.Rptr. 397, 477 P.2d 421], on which defendant relies, applies only to a pre-trial writ application and not to an appeal after judgment. Had the motion to dismiss been granted on January

[7] Ten days after the last date to which defendant had consented. (Pen. Code, § 1382, subd. 2.)

[8] Defendant protected his rights by a prompt objection to the continuance and by a timely motion in the trial court to dismiss for the delay. On February 26, 1970, Division Five of this court denied without opinion his petition for a writ, based on the events above recounted. (*Grey* v. *Superior Court*, 2d Civ. No. 35997.)

13, 1970, or at any later date during that spring, the People could have refiled and started the statute running again. (Pen. Code, § 1387; *People v. Romero* (1936) 13 Cal.App.2d 667 [57 P.2d 557].) Under those circumstances, and absent any showing in the trial court or here of any unusual circumstances, defendant has not shown the prejudice that *Wilson* requires.

## V

During the course of preparation for trial, an investigator for the defense had a telephone conversation with Brown's father. That conversation, with the father's implied consent, was tape recorded by the investigator. The father was called and testified for the People. In cross-examination, defense counsel made reference to the recorded conversation in a manner that implied that the in-court testimony differed from the statement made to the investigator. Over defense objection, the trial court granted to the People discovery of the contents of the tape.[9]

The objection in the trial court was based on the contention that, since the investigator was working for, and retained by, defense counsel, the recording represented a "work product" of that attorney. In this court, the briefs discuss the matter as though it involved the kind of "discovery" involved in *Prudhomme* v. *Superior Court* (1970) 2 Cal.3d 320 [85 Cal. Rptr. 129, 466 P.2d 673].[10]

We cannot see that the order to produce, even if erroneous, created any prejudice. The defense did not offer into evidence either the tape or a transcript made from it as a basis for impeachment. So far as we can discover from the record, neither the defense nor the prosecution ever referred to the tape again or played it or any part thereof to the jury. As far as this record shows, the only result of the trial court's order was to satisfy the curiosity of the prosecuting attorney. We must assume that, after satisfying that curiosity, the prosecutor decided, for reasons not disclosed to us, to drop the entire matter. Thus we do not reach either the issue raised below or the issue briefed here.

## VI

One witness called by the People was a young woman named Linda Mehlinger. She had been (and inferentially still was) defendant's fiancee;

---

[9]We cannot find in the record any showing that the order was complied with; both counsel assume that it was; we indulge in the same assumption.

[10]The trial court's ruling apparently was based on still a third concept—namely that, since the defense had opened up the issue of the telephonic and recorded conversation, the People were entitled to bring out (if they so desired) the complete conversation.

she had been involved with the ownership or possession of some of the automobiles referred to in the testimony; whether or not that involvement had been criminal, at least she had sought and received a formal grant of immunity as the price of her testimony. Her testimony was (to put it mildly) confused and frequently internally contradictory. The trial court pointed out that her demeanor on the stand gave indication that she was inclined to favor the defense as much as possible. For those reasons, the trial court ordered defense counsel to refrain from the use of leading questions in his cross-examination of Miss Mehlinger.

We can see no error. This is the exact situation envisaged by the official comment to section 767 of the Evidence Code[11] and by Dean Wigmore. (3 Wigmore, Evidence (3d ed. 1940) § 773, pp. 130-131.) We cannot say that the trial court abused the discretion vested in it to control the use of leading questions.

## VII

Brown had pleaded guilty, in another court and before another judge, to an information charging him with his part in the offenses herein involved, and had been granted probation. Cross-examination by defense counsel had developed that one of the police officers investigating the present offense had written a letter to the judge in Brown's case, seeking favorable sentencing for him because of his aid in solving the case against defendant. That letter made reference to defendant's possible involvement in a case relating to a third car. After much argument, the trial court permitted the entire letter to be read to the jury by the prosecution. It is argued that this violated the general rule against proof of other offenses. While we think that the trial court might well have ordered the deletion of the reference herein objected to, we can say that the error, if error it was, could not have been prejudicial. The whole case had shown that defendant and Brown were engaged in a widespread operation involving the theft, disguising and re-selling of many cars. The interjection into that story of one more possible theft could not have added anything significant to the jury's deliberations.[12]

---

[11]Section 767: "The court may also forbid the asking of leading questions on cross-examination where the witness is biased in favor of the cross-examiner and would be unduly susceptible to the influence of questions that suggested the desired answer."

[12]The reference (in Officer Sechrengost's testimony as to his conversations with Miss Mehlinger) to the fact that she had told him that defendant and John Dietrich had rebuilt and repainted a Cadillac for Miss Mehlinger's father in the latter's garage, was even less prejudicial. Admittedly, that was the business in which defendant and Dietrich were publicly engaged. Miss Mehlinger's statement contained no inference that this was not one of their legitimate operations. It served only to show (what was

Defendant was fairly tried and justly convicted. The judgment (order granting probation) is affirmed.

Jefferson, Acting P. J., and Dunn, J., concurring.

---

otherwise made clear) that the relations between the Mehlingers and defendant were close and friendly.