[Crim. No. 22928. Second Dist., Div. Five. Oct. 31, 1974.]

THE PEOPLE, Plaintiff and Respondent, v.
KEITH CONWAY, Defendant and Appellant.

**COUNSEL**

Gladys Towles Root for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Donald J. Oeser and Robert R. Anderson, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**STEPHENS, J., Acting P. J.**—By indictment, defendant Keith Conway (appellant)[1] and codefendants Lloyd Conway, Leo Mercado, and Carlos Reynaldo were charged in count I with violation of Penal Code section 487[2] (grand theft). In count II, appellant Keith Conway and codefendant Lloyd Conway were charged with grand theft, in violation of Penal Code section 487. In counts III through V, appellant and codefendants Lloyd Conway and Leo Mercado were also charged with violation of section 487. Appellant pleaded not guilty to all counts. His motion to set aside the indictment pursuant to Penal Code section 995 was denied. He waived trial by jury, and his motion pursuant to Penal Code section 1538.5 was also denied. The prosecution stipulated that Business and Professions Code section 17500 (false advertising) could be considered as a lesser included offense.[3] It was also stipulated that the case be submitted on the transcript of the grand jury proceedings.[4] Appellant was found guilty on all five counts of uttering false or misleading statements in violation of Business and Professions Code section 17500. He was sentenced to three years summary probation, which would terminate upon the payment of a total fine of $2,000. Appellant appeals from the judgment.

---

[1]While there were two appellants in this case, the appeal of Leo Mercado was dismissed pursuant to rule 17(a) of California Rules of Court for failing to file an opening brief within the allowable time period.

[2]Penal Code section 487 in pertinent part provides: "Grand theft is theft committed in any of the following cases: 1. When the money, labor, or real or personal property taken is of a value exceeding two hundred dollars."

[3]Business and Professions Code section 17500 provides: "It is unlawful for any person, firm, corporation, or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services . . . or to induce the public to enter into any obligation relating thereto, to make or disseminate . . . in any . . . publication . . . or in any other manner or means whatever, any statement, concerning such real or personal property or services . . . or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or . . . any such statement as part of a plan or scheme with the intent not to sell such personal property or services . . . so advertised at the price stated therein . . ."

[4]In *In re Mosley*, 1 Cal.3d 913 [83 Cal.Rptr. 809, 464 P.2d 473], the court held that a stipulation to submit a case on the transcript of the preliminary hearing is tantamount to a plea of guilty and a purported waiver of appellant's rights to plead not guilty, to a jury trial, and to confront and present witnesses. But in the instant case, defense counsel stipulated to submit the case on the grand jury transcript. We are of the opinion that such a submission is valid in light of the fact that appellant waived his right to a jury trial and his right to confront and cross-examine the witnesses who testified at the grand jury hearing. (*Id.,* at pp. 924-925.)

## Facts

This case involves the sale of automobiles by allegedly false representations made to members of the general public by Pasadena Motors,[5] an automobile dealership located in Pasadena, California. Appellant was the president of the dealership; defendant Lloyd Conway was the general manager; defendant Mercado was the sales manager; and defendant Reynaldo was a used car salesman.[6]

The five counts of grand theft alleged in the indictment are based upon testimony concerning five separate sales transactions, all of which had the common element of a customer receiving something of lesser value than bargained for after having relied on representations made by either appellant, Lloyd Conway, Mercado, or salesmen. Their actions can be categorized as follows: used cars were sold as new cars; merchandise was switched between bargain and delivery; agreed upon sales price was inflated in favor of the seller when it was finalized in the written contract; and buyers who received automobiles in need of repairs were denied these repairs by Pasadena Motors' failure to honor warranties or to keep promises made at the time of sale.

## Count 1:

On September 1, 1969, Jose S. Alcalde went to Pasadena Motors, where he met codefendant Reynaldo. Alcalde told Reynaldo in Spanish that he was looking for a transportation vehicle. Reynaldo indicated that he had a 1965 Chevrolet which was in good condition and had a one-year guarantee. Alcalde agreed to purchase the car, and was introduced to the sales manager, codefendant Mercado. Mercado reaffirmed the fact that the car was covered by a one-year warranty. Alcalde signed the contract, which he understood included insurance, and put down a check for $490 as the down payment. The following day, Alcalde was involved in an accident with the Chevrolet because the brakes went out. He returned to Pasadena Motors and spoke to Mercado, who told him, "You don't have to worry. I'm going to fix that car." However, he informed Alcalde that Alcalde would have to pay for the damage. Alcalde then went to Mr. Kusada's office. Kusada, who took care of the credit and insurance end of the transaction, told Alcalde that he would have to sign up for more insurance or he would

---

[5]Pasadena Motors was a Ford dealership. There is no misconduct charged on the part of the Ford Motor Company or Pasadena Motors as a corporation. (See *Commonwealth* v. *Beneficial Finance Co.* (1971) 360 Mass. 188 [275 N.E.2d 33, 86, 52 A.L.R.3d 1143].

[6]Defendants were not charged with the substantive crime of conspiracy. (See *Saugstad* v. *Superior Court*, 183 Cal.App.2d 277, 287-288 [6 Cal.Rptr. 580].)

lose the car and his job. Kusada also told Alcalde to write down all the things that needed to be repaired on the Chevrolet. Alcalde wrote down that the brakes, radio and the emission of heavy smoke needed to be fixed. Mercado promised that he was going to repair the car.

Fifteen days later, Alcalde returned to pick up his car. After driving a few blocks, he noticed that the same heavy smoke was being emitted from his exhaust. As a result, he returned to Pasadena Motors and complained to Mercado, who told him that he had done everything he promised to do and that he was not going to do anything else. Alcalde asked for his money back, but Mercado refused.

After talking to his attorney, Alcalde returned and told Mercado that he wanted to buy a new car. He had seen Pasadena Motors' newspaper advertisements of a Maverick at only $2,200. Alcalde told Mercado that he wanted a new Maverick at that price, but he was informed that he would have to pay more money because he did not have any credit. Reynaldo took Alcalde to the lot, and Alcalde picked out a new Maverick. He was told by Reynaldo that the car had a five-year or 50,000 mile warranty. Mercado told Alcalde that because of his credit the price of the car would be $2,400. After signing the contract, Alcalde went out to pick up his car. However, he noticed that there were numerous dents in the automobile, that the hood was not matching, and that the car had 900 miles on it. Mercado explained that the car was a new car but that sometimes cars on the lot are hit when other cars are moved.

Sometime after the purchase of the Maverick, Alcalde was contacted by Pasadena Motors and told that he would have to arrange his own financing or they were going to repossess the car. Alcalde went to Bank of America, but they refused to finance the car because it was not a new car and it was more expensive than a new car.

On October 14, Alcalde contacted Ms. Elizabeth Steidel of the Consumer Complaint Center, and he lodged a complaint concerning the purchase of his motor vehicle from Pasadena Motors. Ms. Steidel, accompanying Alcalde, went to Pasadena Motors and talked to the appellant, Keith Conway; she informed appellant that Alcalde had paid more for a used car than a new one and that Alcalde did not know that it was used when he purchased it. Appellant stated that their service company would take care of the car, that they would repair the damages, and that he would give Alcalde a check for $75 to compensate him for what Alcalde believed he overpaid for the vehicle. Alcalde agreed to this arrangement. However, when he took his car to the body shop to be repaired, they refused to fix the car. They told him the car was covered only by a one-year or 10,000-mile warranty. The car sold to Alcalde was in fact a used car.

*Count II:*

On April 11, 1970, Ms. Phyllis K. Wilson and her husband, Willis, went to Pasadena Motors to shop for a car. They talked to a salesman, Mr. Carrier, and told him they were interested in a Mustang. They decided to purchase a 1967 Mustang for $1,895. As part of the purchase price, they wanted to trade in their 1962 pickup for $800. Mr. Marinelli, one of the sales managers, agreed to these amounts, asked Ms. Wilson if she had the pink slip to the truck, and when she indicated that she did, he asked to see it. The manager insisted that "if you want to make this deal, you better sign [the pink slip]." Ms. Wilson replied that she had to ask her husband, who was test driving the Mustang. The manager responded that "if you don't sign it now, we're not going to make a deal." She signed the pink slip because she knew her husband wanted to purchase the Mustang. She was then led into the office of Mr. Kusada, who turned on a tape recorder while he was writing the contract. He told her that she was getting $600 for the trade in. When Ms. Wilson responded that they were supposed to get $800, he proceeded to turn off the tape machine. Every time Ms. Wilson or her husband (who had rejoined them) objected to anything that was not in conformity with what the sales manager had said, the tape recorder would be turned off. The Wilsons were told that they would have to take the $600 because "A deal is a deal. You signed the pink slip. You don't no longer own the '62 pickup." Feeling that they were stuck, they signed the contract. They were also told that if they did not procure a cosigner within three days they would forfeit the trade-in and the car they were buying.

Mr. Carrier had told Ms. Wilson that the car was in good mechanical condition. However, Ms. Wilson felt that the car was a "death trap" since the brakes were not working, the tires were bald, and considerable mechanical work needed to be done. Also, she had been told that there was a five-day trial exchange period and, "If you don't like it, come in and bring it back, and you can get another car." When she attempted to get another car within the five-day period, she was told that there was no five-day trial exchange on the car. Codefendant Lloyd Conway told her, "That's tough. A deal is a deal. You bought that car, you drive it."

After Ms. Wilson complained to Ford Motor Credit and the DMV, appellant Keith Conway contacted Ms. Wilson. She told him that she was going to let the car be repossessed. He told her that "You don't want to do that . . . . What can I do to keep you from complaining to them [the DMV]?" Appellant also told Ms. Wilson that he did not know anything about the transaction and that a salesman had done it all. Appellant offered Ms. Wilson "$50 better than any deal that you can get any place else." Ms.

Wilson agreed to purchase a pickup truck. He told her that the payments would be around $60 a month. She agreed. Sometime later, appellant called Ms. Wilson and told her that the truck was ready. Ms. Wilson responded, "Before we come down again, is it the one you quoted, are the payments $60?" Appellant replied, "Yes, I got the contract all written out. . . . With everything, your payment is eighty-six dollars a month, and no pickup payment." After the Wilsons went back to Pasadena Motors, they discovered that the payments were up to $100 a month and that the truck was not equipped the way they had asked. Ms. Wilson told appellant that the air conditioning and the power steering were not on the truck, and he responded, "That's no problem. When I get them [air-conditioning and power steering units) in, you bring the truck in and we'll have them put in for you." The contract price was then raised to $3,300 because of these additions. However, the Wilsons never received the air conditioning and power steering; nor did they receive the power brakes which had also been promised.

### Count III:

On August 10, 1969, Ms. Leona DeBose and her son, David, went to Pasadena Motors and requested to see the advertised "Mustang." She was told that the car had already been sold and the remaining ones were very expensive. Ms. DeBose could not afford the cars mentioned by the salesman, Mr. Brody, but looked around and found a 1968 Chevrolet Malibu. She was told that the car was in good condition, having been owned by only one person. It was also represented that the car was being sold on a trial exchange basis. The final price she was supposed to pay for the automobile was $2,500. It was her understanding that this car had a new car warranty and that if anything went wrong, she could have it repaired at any Chevrolet dealership. She put $300 down in cash and sent in another $300 the next day, making the total down payment of $600. Ms. DeBose picked up the car 10 days later because every time she would go to pick it up there "would be something wrong with it." When she finally picked up the car, she discovered that it would not start (apparently because the battery was dead). The following day, Ms. DuBose called Pasadena Motors, talked to codefendant Mercado, and told him that the car was not running. He told her to bring it in and it would be fixed. After getting the car started, she drove it to Pasadena Motors. When she got there, since there were so many things wrong with the car, she asked someone whether she could pick out another car. She was told she couldn't, or else she would lose her down payment of $600. She was allowed to pick out another car after further negotiations. This time she picked out a Ford Maverick and was under the impression that the total price of the car would be $2,800.

However, the total price of the car was $3,945. Furthermore, she was told that the insurance was included in the purchase price, but after getting into an accident she was informed by Pasadena Motors that the car was not insured.

*Count IV:*

On October 16, 1969, Ms. Frances E. Neal went to Pasadena Motors after having seen an advertisement on television. She met a salesman named Larry and explained to him that she was looking for a new car. She signed a contract for a 1970 white Mustang at a price of $3,295. The following day Ms. Neal and her husband returned to Pasadena Motors, where they were asked to sign another contract. They were taken to a blue-colored car, but Ms. Neal said, "That's not the car." Mercado replied, "That's the one you signed for." Furthermore, it was Ms. Neal's understanding that the car she was purchasing was a new car. However, Kusada, who arranged the credit transaction, informed her that it was a demonstration model but that it had never been sold before. The warranty card Ms. Neal received in the mail for the automobile was in someone else's name.

Ms. Neal purchased the car with the understanding that it was covered by a five-year warranty "on the back end and the motor" and a one-year warranty "for the smaller things." Shortly after purchasing the car, she brought it in because the door would not close properly. Later, she took the car in again for repair of the air conditioner, but she was charged for the repair. Ms. Neal complained to Mercado about the air conditioning. He told her that the car was a 1969 used car and the one-year warranty which covered the air conditioning had expired since it ran from the date the car was originally sold and not from the date that Ms. Neal purchased it.

*Count V:*

On May 23, 1970, Ms. Mildred J. Wade went to Pasadena Motors and told the salesman that she wanted to buy a moderately priced car. Ms. Wade was shown a white Ford Falcon with red upholstery. The salesman told her that he could arrange to have her purchase the car for about $100 a month. However, she refused to take the car after she was informed that it would cost $140 a month. She asked for return of the check which she had given to the salesman as a down payment on the Falcon. Mercado responded, "Oh no, I got the right thing for you . . . I'll find you something." Mercado took Ms. Wade to the lot and showed her a demonstrator car. He indicated that no one had ever really used the car, stating: "This is a new car we have had here on the lot. We have used it only for demon-

stration." Ms. Wade didn't like it because it was "all banged up." Mercado told her that he would have the car fixed. After Ms. Wade's husband complained that the tires were bad, Mercado agreed to put four new tires on the car. She agreed to purchase the car for $3,300. She was taken into Kusada's office, and he wrote up the contract. Ms. Wade understood that Pasadena Motors would carry the insurance on the car. Ms. Wade was also promised that everything that was mechanically wrong with the car would be fixed, and that the car had a five-year or 50,000-mile warranty. After purchasing the car, she discovered that the brakes were bad and needed to be repaired. She brought the car back to Pasadena Motors, and Mercado told her that he would take care of it. However, after she got her car back, the brakes were still not functioning properly. She took the car back again to Pasadena Motors and talked to a mechanic. She was told that they were "not going to do anything for you. We've already lost money on you." Codefendant Lloyd Conway similarly told her, "Well, we've lost a lot of money fixing it up for you anyway, and now it is your car." She never received the new tires that she was promised, and the problems with the car were never fixed. The car in fact had 22,000 miles on the speedometer.

## Contentions

Appellant contends that (1) he was indicted without probable cause and upon legally incompetent evidence; (2) appellant was indicted by reason of misrepresentation by the district attorney; (3) the district attorney engaged in prejudicial conduct at the grand jury hearing; (4) appellant was deprived of a fair and impartial hearing before the grand jury; (5) appellant's motion pursuant to Penal Code section 995 should have been granted; and (6) appellant's motion pursuant to Penal Code section 1538.5 should have been granted.

We first respond to appellant's argument that he could not be held criminally liable for the acts of the "others"[7] merely by reason of his official

[7]In order to indict the defendants for grand theft the grand jury must have concluded that the following elements of the crime were sufficiently established: (1) the making of a false representation; (2) knowledge that the representation is false with intent to deprive the owner of his property; and (3) proof that the owner was actually defrauded and that he parted with his property in reliance on false representations. (*Perry v. Superior Court*, 57 Cal.2d 276, 282-283 [19 Cal.Rptr. 1, 368 P.2d 529]; *People v. Parker*, 235 Cal.App.2d 86, 92 [44 Cal.Rptr. 900].) The intent to defraud is a question of fact to be determined from all the facts and circumstances of the case. It may be, and usually must be, inferred circumstantially. (*People v. Caruso*, 176 Cal.App.2d 272, 278 [1 Cal.Rptr. 428].) Furthermore, guilty knowledge may be inferred from the facts proved. (*People v. Brady*, 275 Cal.App.2d 984, 995 [80 Cal.Rptr. 418].) The false representations must have materially influenced the owner to part with his property, but it need not be the sole inducing cause.

position of president of Pasadena Motors unless he directly participated in the activity or authorized it. We have found several cases which shed light on this issue. In *Otis* v. *Superior Court,* 148 Cal. 129, 131 [82 P. 853], the Supreme Court held that an affidavit which merely set forth that H. G. Otis was president and general manager of the Times Mirror Company on the day that an allegedly contemptuous article was published in the Los Angeles Times was insufficient to warrant the imposition of criminal liability. The court expressed the rule as follows: "An officer of a corporation is not criminally answerable for any act of a corporation in which he is not personally a participant, and it does not follow as a legal conclusion that the manager or assistant manager of a corporation engaged in the publication of a daily newspaper acts at all times, or even at any time, as its editor. To make the petitioners liable in contempt for matter appearing in the Times, it was necessary to show, and therefore essential to charge, that they personally caused, *or, being in control, at least permitted,* the publication of the articles in question." (Italics added.) The court thus did not find Otis criminally liable because there was no allegation made in the affidavit that he had the *requisite control* over the publication. (See also *People* v. *Epstein,* 118 Cal.App. 7, 10 [4 P.2d 555].)

However, in *People* v. *International Steel Corp.,* 102 Cal.App.2d Supp. 935, 942 [226 P.2d 587], the court held the corporate defendant and its officer and manager in charge of its Los Angeles plant criminally liable for violating a Health and Safety Code section proscribing the emission of pollutants into the air. Implicitly, the court must have concluded that the general manager had control over the activities of the plant. Nevertheless, it came to a different conclusion in determining the liability of the secretary of the corporation. The court, following the rationale of the *Otis* case, stated that although the secretary had knowledge of the pollution by the plant, there "is nothing to show that he had any control over these operations." It concluded that a secretary of a corporation without such *control* is merely a ministerial officer and should not be held criminally liable.

There is also ample authority in other jurisdictions in support of the principle that the president of a corporation which is engaged in unlawful activity may be held criminally liable for the acts of subordinates done in the normal course of business regardless of *whether or not* he personally supervised the particular acts done or was personally present at the time and place of the commission of the unlawful acts. (*Carolene Products Co.*

---

(*Perry* v. *Superior Court, supra,* at p. 286.) A false representation as to the condition of an automobile and a promise to do something in the future with no present intention of performing both fall clearly within the purview of Penal Code section 487.

Appellant was convicted of false advertising, the lesser included offense, by stipulation, and not grand theft.

v. *United States,* 140 F.2d 61; *United States* v. *Laffal* (D.C.Mun.App.) 83 A.2d 871; *State* v. *Burnam,* 71 Wash. 199 [128 P. 218].) As the court aptly stated in *Laffal:* "Here, there was reason to believe that the corporation was conducting its business . . . in such a manner as to constitute the offense . . . . The president of a corporation is generally its chief executive officer and it is a fair inference that he is acquainted with the conduct of business of the corporation. If the corporation in the. conduct of its business was . . . [violating the law] there was probable cause to believe that its president knew of it and either procured it to be done, or permitted it to be done, or did nothing to prevent it. [Fn. omitted.]" (*Id.,* at p. 872.)

In the instant case, the articles of incorporation of Pasadena Motors listed Keith Conway as president. Kusada testified that both appellant and codefendant Lloyd Conway operated the business. Although appellant's function was generally administrative, Kusada testified that appellant also conducted the sales activities in the absence of Lloyd Conway. Thus, we are of the opinion that Kusada's testimony, along with the testimony of the five victims, is sufficient to show that appellant, as president of Pasadena Motors, was in a position to *control* the activities of the dealership and thus could be held criminally liable for false advertising.

We are also convinced that there was sufficient evidence that appellant authorized the unlawful activity. Appellant argues that he only wanted to remedy the situation after the customers complained. This is precisely the point. After being informed of the practices of his subordinates by Mr. Elmer Kunkle, special investigator for the Department of Motor Vehicles, and by Ms. Elizabeth Steidel, he allowed these subordinates to continue in their positions and carry on their unlawful practices for the benefit of Pasadena Motors. The evidence shows a repeated pattern of illegal conduct by the agents of Pasadena Motors which indicates inferentially appellant's toleration, ratification, or authorization of their illegal actions. (Cf. *Saugstad* v. *Superior Court, supra,* 183 Cal.App.2d 277, 287-288.) Thus we conclude that appellant may be held criminally liable because as president of the dealership,. he had the requisite control over the activities of the dealership and permitted the unlawful practices to continue after being informed of them on numerous occasions.

### Section 995 Motion

Appellant next contends that his motion pursuant to Penal Code section 995 to dismiss the indictment should have been granted because the district attorney in his prepared statement given to the grand jury foreman failed to instruct the foreman and/or the grand jury that his statement

was not to be considered as evidence.[8] Furthermore, appellant asserts that the evidence presented to the grand jury was insufficient and legally incompetent in that it was placed before the grand jury in a prejudical manner to "mislead the grand jury to an erroneous conclusion." The objected-to statement of the district attorney reads as follows: "This case concerns the sale of automobiles by means of false representations made to members of the general public by Pasadena Motors, a car dealership located in the City of Pasadena, California.

"Over 500 complaints have been received on the transactions engaged by this company and 5 representative sales transactions have been selected to present to the Grand Jury.

"Pasadena Motors was a Ford dealership denominated as a dealer development company. This meant that Ford Motor Company actually owned the company and that the president, Keith Conway, the general manager, Lloyd Conway, were operating the business and in effect buying it from Ford Motor Company out of the proceeds.

"There is no misconduct charged on the part of Ford Motor Company. Lloyd and Keith Conway set the policy for selling cars by means of misrepresentation. Leo Mercado was the sales manager and in effect closed the car deals. He was also involved in the misrepresentation. Carlos Reynaldo was a used car salesman who initially met members of the public and was also involved in the misrepresentation made in the particular transaction alleged.

"The victims in this case for the most part come from minority group or groups of persons who are uneducated and unsophisticated and are therefore easily taken in by the sharp selling practices followed by Pasadena Motor Company.

"Any member of the Grand Jury who has a state of mind in reference to the case or to any of the parties involved which will prevent him from acting impartially and without prejudice to the substantial rights of any parties will now retire." Specifically, appellant asserts that the following

---

[8]Penal Code section 939.5 provides: "Before considering a charge against any person, the foreman of the grand jury shall state to those present the matter to be considered and the person to be charged with an offense in connection therewith. He shall direct any member of the grand jury who has a state of mind in reference to the case or to either party which will prevent him from acting impartially and without prejudice to the substantial rights of the party to retire. Any violation of this section by the foreman or any member of the grand jury is punishable by the court as a contempt."

allegations were never proved:[9] (a) that Pasadena Motors was a dealer development company which was being purchased from the Ford Motor Company and that appellant was the president; (b) that more than 500 complaints had been made against Pasadena Motors; (c) that most of the complaining victims were members of minority groups or uneducated and unsophisticated persons who were easily taken in by sharp selling practices.[10]

Respondent argues that the only issue regarding the indictment which is within the appropriate scope of appellate review is whether appellant's motion to dismiss pursuant to Penal Code section 995[11] was properly denied. We agree with respondent's contention. Section 995 does not authorize the setting aside of an indictment in the instant case on the ground of insufficient or incompetent evidence received by the grand jury. (See *People* v. *Freudenberg,* 121 Cal.App.2d 564, 573 [263 P.2d 875]; *People* v. *Hatch,* 13 Cal.App. 521, 528 [109 P. 1097].) In *Hatch,* the district attorney advised the grand jury that there was adequate evidence to warrant the finding of an indictment. In reference to the alleged misconduct of the district attorney in his statement to the grand jury, the *Hatch* court stated: "[It] cannot be claimed that this conduct affected the validity of the grand jury itself. It is presented simply as misconduct on the part of the district attorney. The authorities seem to be agreed that a district attorney should refrain from expressing an opinion to the grand jury as to the effect of evidence or the sufficiency thereof. *But the only grounds for which an indictment found and returned by a valid grand*

---

[9]There is nothing in the language of Penal Code section 939.5 which requires that the district attorney must present evidence which would prove each assertion contained in the statement. So long as there is sufficient competent evidence presented to the grand jury to show probable cause to issue the indictment, the fact that the foreman's statement asserted facts that were not subsequently established would not vitiate the indictment.

[10]Although there was no evidence introduced that Pasadena Motors was a Ford development company, the articles of incorporation of Pasadena Motors were produced and listed Keith Conway as president of the corporation. Rather than the 500 complaints which were mentioned in the foreman's statement, evidence of 200 complaints and 300 irregularities in the procedures of Pasadena Motors was introduced in the grand jury proceeding. This discrepancy cannot be characterized as having prejudiced the grand jury since the indictment in this case was based not on the 500 complaints, but on 5 specific instances of grand theft. As for the statement that most of the victims were members of minority groups or uneducated and unsophisticated persons, it is obvious that the victims were not sophisticated or knowledgeable of their rights.

[11]Penal Code section 995 in pertinent part provides: "The indictment . . . must be set aside by the court in which the defendant is arraigned, upon his motion, in either of the following cases: . . . 1. Where it is not found, endorsed, and presented as prescribed in this code. 2. That the defendant has been indicted without reasonable or probable cause." (See *People* v. *Boehm,* 270 Cal.App.2d 13 [75 Cal. Rptr. 590].)

*jury may be set aside are those specified in section 995 of the Penal Code, and we do not think that this comes within any of the provisions of said section.* The law contemplates that only competent evidence be received by the grand jury, yet if it should receive incompetent evidence and found an indictment thereon, there is no method of reviewing its action in so doing. An indictment is but an accusatory paper, and it was never intended that on a motion to dismiss, irregularities in the proceedings before the grand jury should be reviewed, except as expressly provided in the statute. 'An indictment is a record of the action of a judicial body, and such action is final when there is no appeal therefrom and no other method provided for reviewing it.' [Citation.]" (Italics added.) (*Id.*)

As we have noted, the only statutory basis upon which appellant may attack the indictment in the instant case is lack of probable cause. Consequently we consider the question of whether there was sufficient probable cause to issue the indictment. Penal Code section 939.6[12] provides that the fact that some incompetent evidence is presented to a grand jury will not void an indictment if there is other competent evidence received by the grand jury which would in itself constitute probable cause to issue the indictment. (See *People* v. *Crosby,* 58 Cal.2d 713, 725 [25 Cal.Rptr. 847, 375 P.2d 839]; *McFarland* v. *Superior Court,* 88 Cal.App.2d 153, 158 [198 P.2d 318].) Thus the indictment in the instant case may only be set aside if there is no probable cause to believe that defendant is guilty of the crime charged. ■ In this respect, it must be remembered that "[p]robable cause is shown if a man of ordinary caution or prudence would be led to believe and conscientiously entertain a strong suspicion of the guilt of the accused. . . . An indictment will not be set aside or prosecution thereon prohibited if there is rational ground for assuming the possibility that an offense has been committed and the accused is guilty of it." (*Bompensiero* v. *Superior Court,* 44 Cal.2d 178, 183-184 [281 P.2d 250]; *Roads* v. *Superior Court,* 275 Cal.App.2d 593, 597 [80 Cal.Rptr. 169].) In *Lorenson* v. *Superior Court,* 35 Cal.2d 49 [216 P.2d 859], the Supreme Court held that on a 995 motion a court may not substitute its judgment as to the weight of the evidence for that of the grand jury. ■ "If there is some evidence to support the indictment, the courts will not inquire into its sufficiency." (*Greenberg* v. *Superior Court,* 19 Cal.2d 319, 322 [121 P.2d 713]; *Kohn* v. *Superior Court,* 239 Cal.App.2d 428, 430 [48 Cal.Rptr. 832].) ■ An ex-

---

[12]Penal Code section 939.6 in pertinent part provides: "The grand jury shall receive none but evidence that would be admissible over objection at the trial of a criminal action, but the fact that evidence which would have been excluded at trial was received by the grand jury does not render the indictment void where sufficient competent evidence to support the indictment was received by the grand jury."

amination of the grand jury transcript reveals that there is "some" evidence to support the indictment. It is clear that appellant was cognizant of the deceptive practices that were being employed by Pasadena Motors. Between 1965 and 1970, Mr. Elmer Kunkle, special investigator for the DMV testified that he discussed approximately 200 complaints of misrepresentations with appellant and codefendant Lloyd Conway. Furthermore, Ms. Elizabeth Steidel also testified that she discussed customer complaints with appellant. Not only did appellant have knowledge of the deceptive practices, it appears that he was also involved in the sales transactions between Alcalde and Ms. Wilson. In fact, Ms. Wilson testified that Keith Conway called her after finding out that she had lodged a complaint with the DMV and asked her, "What can I do to keep you from complaining to them?" The testimony of Ms. Wilson, taken in conjunction with the fact that appellant had full knowledge of the deceptive practices carried on by Pasadena Motors, provides the basis for an inference that appellant was a participant in the unlawful activity.[13] We do not substitute our opinion for that of the grand jury, or reweigh the evidence adduced.

■ Appellant also contends that he was denied a fair hearing because the district attorney was obligated to give him notice of the grand jury proceeding so that he would have an opportunity to present exculpatory evidence to the district attorney, who in turn had the duty to present this evidence to the grand jury. We reject this contention. Notice is not required by Penal Code section 939.7, which provides: "The grand jury is not required to hear evidence for the defendant, but it shall weigh all the evidence submitted to it, and when it has reason to believe that other evidence within its reach will explain away the charge, *it* shall order the evidence to be produced, and for that purpose may require the district attorney to issue process for the witnesses." (Italics added.) In *People* v. *Goldenson,* 76 Cal. 328, 345 [19 P. 161], the Supreme Court rejected this identical argument, stating: "The defendant was not entitled to notice that the grand jury was investigating a charge against him, nor was he entitled to be heard or have witnesses sworn and examined by that body, unless it called for the same." (See also *People* v. *Finkel,* 70 Cal.App. 2d 508, 516-517 [161 P.2d 298].) There is nothing in the record to indicate that the grand jury ever requested any evidence to be produced.

---

[13]It is well settled that all persons connected with the commission of a crime, whether they directly commit the act constituting the offense or aid and abet in its commission, are equally guilty. (Pen. Code, § 31; *People* v. *Gordon,* 10 Cal.3d 460, 468 [110 Cal.Rptr. 906, 516 P.2d 298].) One aids and abets in the commission of a crime if one instigates, encourages, or renders aid with guilty knowledge of the wrongful purpose of the perpetrators. (*People* v. *Belenger,* 222 Cal.App.2d 159, 163 [34 Cal.Rptr. 918].)

## Motion to Suppress

■ Appellant also contends that the documents submitted to the grand jury were unlawfully seized by DMV investigator Kunkle. This motion to suppress was directed to certain documentary evidence obtained from the files of Pasadena Motors: (1) registration forms and paper license plates which dealers are required by law to keep for the DMV; and (2) contractual documents which were part of Pasadena Motors' own records. It is clear that the registration forms which are required and constitute DMV records were properly seized. Vehicle Code section 11714, subdivision (c) provides: "The department shall also furnish books and forms as it may determine necessary. Said books and forms are and *shall remain the property of the department and may be taken up at any time for inspection.*" (Italics added.) As special investigator for the DMV, Kunkle complied with the provisions of this section and either removed the documents or made photocopies of them. Furthermore, contrary to appellant's argument, this type of regulatory search is not violative of the Fourth Amendment. Most recently, in *People* v. *Grey*, 23 Cal.App.3d 456 [100 Cal.Rptr. 245], the court upheld a search pursuant to Vehicle Code section 2805, which permits the inspection of motor vehicles by California Highway Patrol in public garages and repair shops for the purpose of investigating car thefts. In the present case, Kunkle was not checking motor vehicles, but was checking the records of the dealership. Thus we find no violation of the Fourth Amendment so far as these documents are concerned.

On the other hand, the contractual documents removed by Kunkle do not fall within the purview of Vehicle Code section 11714. However, according to Kunkle's testimony, these documents were voluntarily turned over by Keith Conway after being informed of his *Miranda* rights. Whether consent was given is a question of fact for the trial court. (*Castaneda* v. *Superior Court*, 59 Cal.2d 439, 442 [30 Cal.Rptr. 1, 380 P.2d 641].) After considering the evidence, the trial court found that appellant's consent was voluntary, and not coerced. We conclude that there is sufficient evidence to support the trial court's finding. (See *People* v. *Duren*, 9 Cal.3d 218, 240-241 [107 Cal.Rptr. 157, 507 P.2d 1365]; *People* v. *Brown*, 19 Cal.App.3d 1013, 1017 [97 Cal.Rptr. 341].)

The judgment is affirmed.

Ashby, J., and Hastings, J., concurred.