[No. A128485. First Dist., Div. One. Feb. 24, 2012.]

DANIEL L. BALSAM, Plaintiff and Appellant, v.
TRANCOS, INC., et al., Defendants and Appellants.

[No. A129458. First Dist., Div. One. Feb. 24, 2012.]

DANIEL L. BALSAM, Plaintiff and Respondent, v.
TRANCOS, INC., et al., Defendants and Appellants.

**COUNSEL**

Law Offices of Timothy J. Walton and Timothy J. Walton for Plaintiff and Appellant and for Plaintiff and Respondent.

Nelson & Weinkauf, Robert L. Nelson and Susan B. Cohen for Defendants and Appellants.

**OPINION**

**MARGULIES, J.**—Defendant Trancos, Inc. (Trancos), appeals from a judgment awarding statutory damages and attorney fees to plaintiff Daniel L. Balsam under Business and Professions Code[1] section 17529 et seq. (Anti-spam Law). Balsam cross-appeals from portions of the judgment denying him relief under the Consumers Legal Remedies Act, Civil Code section 1750 et seq. (CLRA), and finding Trancos's chief executive officer (CEO), Brian Nelson, not personally liable for the judgment along with Trancos. We affirm the judgment in all respects.

## I. BACKGROUND

Balsam filed suit against Trancos, Nelson, and other individuals and entities[2] in April 2008, alleging causes of action for (1) violations of section 17529.5,[3] (2) violations of the CLRA, and (3) declaratory relief as to the legality of defendants' actions under these statutes.

A court trial commenced on October 14, 2009. At the outset of the trial, the court ruled Balsam lacked standing to sue under the CLRA because he was not a "consumer" of any goods or services as defined in Civil Code section 1761, subdivision (d) and he did not sustain any damages caused by defendants' conduct as required by Civil Code section 1780. The court further held Balsam's Anti-spam Law cause of action was not preempted by federal law, as asserted by defendants. Balsam agreed to the dismissal of his declaratory relief cause of action before trial.

---

[1] All statutory references are to the Business and Professions Code unless otherwise indicated.

[2] No defendants other than Trancos and Nelson are involved in this appeal.

[3] Section 17529.5 is part of the Anti-spam Law. The term "spam" is defined in the law's findings and declarations to mean "unsolicited commercial e-mail advertisements." (§ 17529, subd. (a).) The probable origin of this popular usage, and its connotation as an annoying, unwanted, repetitive communication, was explained in *Hypertouch, Inc. v. ValueClick, Inc.* (2011) 192 Cal.App.4th 805, 818, footnote 4 [123 Cal.Rptr.3d 8] (*Hypertouch*). (See also *Gordon v. Virtumundo, Inc.* (9th Cir. 2009) 575 F.3d 1040, 1044–1045 & fn. 1 (*Gordon*).)

A. *Trial Evidence*

1. *The Parties*

Nelson is the CEO and founder of Trancos, which operates several Internet advertising businesses. In 2007, Trancos operated a division called Meridian E-mail (Meridian). Through Meridian, Trancos acquired the right to use e-mail address lists from nine entities, including Hi-Speed Media (Hi-Speed), which is owned by ValueClick. Under its agreement with Hi-Speed, Trancos found advertisers that would pay to have their offers and promotions sent out to Hi-Speed's list, and Trancos would split the revenues with Hi-Speed.[4] Trancos hired a consultant, Joe Costeli, to "manage" the list, which meant he would upload the content the advertiser provided for the subject line and body of the e-mail to Trancos's e-mail servers, and send them out. Costeli would generate the domain name used in the "From" line.

Nelson testified he believed Hi-Speed obtained e-mail addresses by using promotions and Web sites in which the consumer gave his or her broad consent to receive future commercial e-mail messages from Hi-Speed or any of its "partners." Nelson maintained such a consent extended to Trancos as well as to any advertiser whose messages Trancos sent out to Hi-Speed's e-mail list, subject to the recipient's right to unsubscribe or "opt out" of future messages, which was offered as an option in all of the commercial e-mail messages Trancos sent.

Balsam is a licensed California attorney with experience in consumer protection litigation. Balsam has been either a named plaintiff or has represented plaintiffs in dozens of lawsuits against companies for unsolicited e-mail advertising. He maintains a Web site and blog with information on spammers and spam litigation. He maintains over 100 e-mail addresses.

2. *The E-mails*

Balsam owns four computers, all of which are located in California. In the summer of 2007, Balsam received eight commercial e-mails sent by Trancos to one of his e-mail addresses using Hi-Speed's e-mail list. According to each of the eight e-mails, Balsam allegedly gave consent for use of his e-mail address on " '2007 July 11' " by responding to an offer on a Web site owned by Hi-Speed using a computer with the Internet protocol address or IP address 64.184.86.246. Balsam presented uncontradicted evidence he could not have accessed Hi-Speed's Web site from that IP address on that date, and

---

[4] Nelson testified that a typical revenue-sharing agreement with Hi-Speed might include a requirement that e-mails be sent out to its list on a daily basis. He estimated Trancos sent millions of e-mails per month.

did not otherwise provide his e-mail address to or consent to its use by Hi-Speed, Trancos, or any of the advertisers named in the eight e-mails.

The e-mails Balsam received had the following relevant content:

E-mail No. 1 stated on the "From" line that it was from "Paid Survey" with an e-mail address of survey@misstepoutcome.com. The subject line stated: "Get paid 5 dollars for 1 survey." The content in the body of the e-mail was a commercial advertisement purportedly by "Survey Adventure." Paid Survey was not the name of any existing company. There was no company named misstepoutcome and no Web site at www.misstepoutcome.com.[5] The latter is a fanciful name Trancos gave to one of the 477 domain names it has privately registered.[6,7] As in all eight of the e-mails, Trancos's name does not appear anywhere in the e-mail.

In regard to opting out of future e-mails, e-mail No. 1 stated the recipient could do so by writing to "Strategic Financial Publishing, Inc." at an address in Indiana or by clicking on a link to "http://misstepoutcome.com./ soi?m=79444&!=2." There was a second opt-out link near the end of the e-mail stating in part "if you no longer wish to receive our emails please click here." The name "USAProductsOnline.com" appeared at the end of the e-mail with a specified street address and suite number on Santa Monica Boulevard in Los Angeles. The domain name, USAProductsOnline.com, is privately registered to Trancos, but there is no actual company named USAProducts-Online.com, no such entity is registered as a fictitious business name of Trancos, and there is no Web site at www.USAProductsOnline.com. The street address given for it is the address of The UPS Store, where Trancos

---

[5] According to Trancos, even though the e-mail addresses appearing on the "From" lines of the eight e-mails, such as survey@misstepoutcome.com, did not reflect the names of any actual Web sites or businesses, they were all functioning e-mail addresses monitored by Trancos to which recipients could have sent return e-mails.

[6] A "domain name" is defined in the Anti-spam Law as an "alphanumeric designation that is registered with or assigned by any domain name registrar as part of an electronic address on the Internet." (§ 17529.1, subd. (e).)

[7] Trancos's domain names were registered through Domains by Proxy, a private registration service operated by The GoDaddy Group, Inc. (GoDaddy). With private registration, members of the public would not be able to determine that Trancos had any connection to the domain name. A search of publicly available databases such as "WHOIS" would show Domains by Proxy or GoDaddy as the domain name's owner, and provide no identifying or contact information about Trancos. According to Nelson, however, GoDaddy would have contacted Trancos if it received inquiries or complaints about commercial e-mails using one of Trancos's registered domain names.

rented a post office box in the name of USAProductsOnline.com. The suite number referenced in the e-mail was actually Trancos's mailbox number at The UPS Store.[8]

E-mail No. 2 stated it was from "Your Business" with an e-mail address of franchisegator@modalworship.com. There was no actual business named Your Business, no actual entity named modalworship, and no Web site at modalworship.com. The subject line stated: "Be Your Own Boss! You could own a franchise!" The body of the e-mail consisted of a commercial advertisement purportedly by Franchise Gator. E-mail No. 2 advised recipients they may opt out by sending a copy of the e-mail to Franchise Gator at a Seattle address or by clicking on a link. Like all eight of the e-mails sent to Balsam, e-mail No. 2 provided a second opt-out link and the name and same Santa Monica Boulevard street address for USAProductsOnline.com.

E-mails Nos. 3 through 8 contained "From" lines stating the sender was, respectively, "Christian Dating," "Your Promotion," "Bank Wire Transfer Available," "eHarmony," "Dating Generic," and "Join Elite." Each purported to be from an e-mail address at a different one of the fancifully named domain names privately registered to Trancos (e.g., moussetogether.com, nationalukulelee.com). Only one of the e-mails, e-mail No. 6 purporting to be from eHarmony, contained the name of an actual, existing company on its "From" line, although the return e-mail address, eHarmony@minecyclic.com, referenced a domain name privately registered by Trancos, not one belonging to eHarmony.

Nelson testified Trancos privately registered its domain names due to past incidents of retaliation and threats, and to protect its employees. According to Nelson, one person angry with the company had bombarded it with millions of e-mails, knocking out Trancos's network for three days and costing the company approximately $120,000. Trancos had also received angry and threatening telephone calls demanding the caller's e-mail address be removed from its list. Nelson testified he had been advised that private registration was a good idea because "what if there's a complaint, you know, I don't want someone like Dan Balsam . . . driving through my front window or coming in there and harassing us or . . . phoning us and badgering us."[9]

---

[8] Balsam was only able to trace the post office box to Trancos by subpoenaing The UPS Store to obtain the application submitted to it for the post office box. The application included a physical address for USAProductsOnline.com in Pacific Palisades that turned out to be Trancos's office at the time.

[9] There was no testimony as to how Costeli chose the actual domain names. It may be inferred one motivation was to avoid disclosing Trancos as the sender. None of the domain names contained any variation or hint of Trancos's name. If the names themselves connected Trancos to the mailing, private registration would be pointless. Other potential motivations for

### 3. The Anti-spam Law

■ Section 17529.5 makes it unlawful as follows to send e-mail advertisements containing certain falsified or misrepresented header information: "(a) It is unlawful for any person or entity to advertise in a commercial e-mail advertisement either sent from California or sent to a California electronic mail address under any of the following circumstances: [¶] . . . [¶] (2) The e-mail advertisement contains or is accompanied by falsified, misrepresented, or forged header information. This paragraph does not apply to truthful information used by a third party who has been lawfully authorized by the advertiser to use that information."

The California statute does not define the term "header information," but the California Supreme Court in *Kleffman v. Vonage Holdings Corp.* (2010) 49 Cal.4th 334 [110 Cal.Rptr.3d 628, 232 P.3d 625] (*Kleffman*) applied a definition borrowed from the federal CAN-SPAM Act of 2003 (CAN-SPAM Act; 15 U.S.C. § 7701 et seq.),[10] which makes it unlawful to initiate transmission of a commercial e-mail message that contains or is accompanied by " 'header information that is materially false or materially misleading.' " (*Kleffman*, at p. 340, fn. 5, quoting 15 U.S.C. § 7704(a)(1).) The federal spam law defines "header information" as "the source, destination, and routing information attached to an electronic mail message, *including the originating domain name and originating electronic mail address, and any other information that appears in the line identifying, or purporting to identify, a person initiating the message.*" (15 U.S.C. § 7702(8), italics added.) Although this case was tried before *Kleffman* was decided, it was undisputed by the parties that the "header information" in the Trancos e-mails, for purposes of section 17529.5, included the purported sender names, domain names, and e-mail addresses that appeared on the e-mails' "From" lines.

■ Section 17529.5 of the Anti-spam Law provides a recipient of an unsolicited commercial e-mail advertisement may bring an action against a person or entity that violates its provisions for either or both actual damages or liquidated damages of $1,000 for each unsolicited commercial e-mail violating the section. (§ 17529.5, subd. (b).) The prevailing plaintiff in such an action may recover reasonable attorney fees and costs. (*Ibid.*)

---

the whimsical name choices—including evading spam filters and avoiding accidental infringement of names used by other businesses or Web sites—are not in issue in this case.

[10] The CAN-SPAM Act's full title is the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003. (Act of Dec. 16, 2003; Pub.L. No. 108-187, § 1, 117 Stat. 2699.)

B. *Statement of Decision*

The trial court found all of the e-mails except the eHarmony e-mail violated section 17529.5, subdivision (a)(2) (hereafter section 17529.5(a)(2)). The court found the header information on each of these e-mails was falsified or misrepresented because it did not accurately represent who sent the e-mail: "All of these emails came from Defendant Trancos, but none of the emails disclose this in the header (or the body or the opt-out). The emails were sent on behalf of eight different advertisers . . . but only eHarmony was a real company. The rest of the 'senders' identified in the headers . . . do not exist or are otherwise misrepresented, namely, Paid Survey, Your Business, Christian Dating, Your Promotion, Bank Wire Transfer Available, Dating Generic, and Join Elite[.] In those same headers reflecting the 'from' line of the email, the referenced sender email is a non-existen[t] entity using a nonsensical domain name reflecting no actual company . . . ." The court added that the issue was not the use of multiple domain names to send spam, which it noted was before the California Supreme Court in the *Kleffman* case. Instead, the court held the falsity or misrepresentation consisted in the fact "that the 'sender' names (or domain names used) *do not represent any real company, and cannot be readily traced back to the true owner/sender.*" (Italics added.)

The trial court awarded Balsam $1,000 in liquidated damages against Trancos for each of the seven e-mails it found to have violated section 17529.5 of the Anti-spam Law, and found Trancos liable for his reasonable attorney fees and costs. It found Nelson was not personally liable for the award. Balsam thereafter sought attorney fees in the amount of $133,830. The court awarded him $81,900 in fees.

C. *Appeals and Cross-appeal*

Trancos appealed from the judgment (case No. A128485) and postjudgment order awarding fees (case No. A129458). Balsam cross-appealed (case No. A128485) on the issues of whether he had standing to sue under the CLRA and whether Nelson was jointly and severally liable for Trancos's violations of the Anti-spam Law. The appeals were consolidated for briefing, argument, and decision.

## II. DISCUSSION

Trancos contends the judgment must be reversed because (1) the California Supreme Court held in *Kleffman* that the sending of commercial e-mails from multiple and nonsensically named domain names does not violate section 17529.5(a)(2), part of the Anti-spam Law, and (2) the federal CAN-SPAM Act preempts application of California's Anti-spam Law in this case absent a

finding of all elements of common law fraud, including reliance and actual damages. Trancos contends in the alternative that, assuming the e-mails did violate the Anti-spam Law, the trial court abused its discretion in granting Balsam $81,900 in attorney fees.

In his cross-appeal, Balsam maintains the trial court erred in (1) finding he lacked standing to seek injunctive relief under the CLRA as a consumer damaged by Trancos's unlawful practices and (2) failing to hold Nelson jointly and severally liable along with Trancos for violating the Anti-spam Law even though Nelson personally participated in and ratified Trancos's tortious conduct.

## A. *Falsification/Misrepresentation*

The specific issue decided in *Kleffman* was whether "it is unlawful [under section 17529.5(a)(2)] to send commercial e-mail advertisements from multiple domain names for the purpose of bypassing spam filters." (*Kleffman, supra,* 49 Cal.4th at p. 337.) By way of background, the *Kleffman* court explained that each entity connected to the Internet (such as a computer or network) must have a unique numeric address, known as an Internet protocol or IP address, that enables other computers or networks to identify and send information to it. (*Ibid.*) An IP address consists of four sets of numbers separated by periods, such as "12.34.56.78." (*Ibid.*) But because the number strings that make up an IP address can be difficult to remember, the Internet community developed the domain name system, which enables users to substitute an easier to remember domain name such as "google.com" for a set of number strings. (*Ibid.*)

Kleffman alleged in his complaint that Vonage, through its marketing agents, sent him 11 unsolicited e-mail advertisements for its broadband telephone services, identifying 11 different domain names as the senders of the e-mail. (*Kleffman, supra,* 49 Cal.4th at p. 338.) The domain names, such as " 'ourgossipfrom.com' " and " 'countryfolkgospel.com' " were all fanciful or nonsensical, and did not refer to Vonage or to any other existing business or entity. (*Ibid.*) All were traceable to a single physical address in Nevada where Vonage's marketing agent was located. The complaint further alleged the use of multiple domain names was for the purpose of evading the spam filters used by Internet service providers to block spam before it reached their customers' e-mail boxes. (*Ibid.*) The complaint alleged " '[t]he multitude of "from" identities falsifie[d] and misrepresent[ed] the true sender's identity and allow[ed] unwanted commercial e-mail messages to infiltrate consumers' inboxes.' " (*Id.* at p. 339.) After removal to federal court, defendant Vonage moved successfully to dismiss the complaint on the grounds that it failed to state a claim under section 17529.5(a)(2). (*Kleffman,* at p. 339.) Kleffman

appealed to the Ninth Circuit, which asked the California Supreme Court to decide whether the use of multiple domain names for the purpose of bypassing spam filters violated the statute. (*Ibid.*)

At the outset of its analysis, the Supreme Court noted there was no dispute the domain names used in the challenged e-mails "actually exist and are technically accurate, literally correct, and fully traceable to Vonage's marketing agents," and the e-mails therefore "neither contained nor were accompanied by 'falsified . . . or forged header information' within the meaning of section 17529.5(a)(2)." (*Kleffman, supra*, 49 Cal.4th at p. 340.) The parties agreed the issue for the court was whether the e-mails contained or were accompanied by " 'misrepresented . . . header information' " within the meaning of that subdivision. (*Kleffman*, at p. 340.) Kleffman argued the domain names, while not actually false, were "misrepresented" because their random, garbled, and nonsensical nature created a misleading or deceptive impression the e-mails were all from different entities when in fact they were all from Vonage via a single marketing agent. (*Id.* at pp. 341–342.)

■ Based on a close reading of the text and legislative history of the statutory language in issue, the Supreme Court rejected Kleffman's argument that the word "misrepresented" in section 17529.5(a)(2) means " 'misleading' " or " 'likely to mislead.' " (*Kleffman, supra*, 49 Cal.4th at pp. 342–345.) The court also found the Legislature did not intend subdivision (a)(2) "generally to prohibit the use of multiple domain names." (*Kleffman*, at p. 345.) Thus, as Kleffman conceded, the mere use of multiple domain names does not " 'in and of itself' " violate the subdivision. (*Kleffman*, at p. 345.)

■ Furthermore, the court found the use of a domain name in a single e-mail that "does not make clear the identity of either the sender or the merchant-advertiser on whose behalf the e-mail advertisement is sent" also does not per se violate section 17529.5(a)(2). (*Kleffman, supra*, 49 Cal.4th at p. 345.) The court found such use does not in fact make any representation, express or implied, regarding the e-mail's source. (*Id.* at pp. 345–346.) In addition, the court concluded that construing the statute otherwise would raise a substantial question about its constitutionality under the supremacy clause of the United States Constitution. (*Kleffman*, at p. 346.) Citing to *Gordon, supra*, 575 F.3d at page 1064, and to the legislative history of the CAN-SPAM Act, the court opined that a state law requiring an e-mail's "From" field to include the actual name of the sender would constitute a content or labeling requirement preempted by the federal law. (*Kleffman*, at p. 346.)

■ While expressly declining to define what the statutory phrase " 'misrepresented . . . header information' " *includes* rather than what it *excludes*, the court reached the following conclusion: "[A] single e-mail with an

accurate and traceable domain name neither contains nor is accompanied by 'misrepresented . . . header information' within the meaning of section 17529.5(a)(2) merely because its domain name is . . . 'random,' 'varied,' 'garbled,' and 'nonsensical' when viewed in conjunction with domain names used in other e-mails. An e-mail with an accurate and traceable domain name makes no *affirmative* representation or statement of fact that is false . . . [and] . . . cannot reasonably be understood to be an implied assertion that the source of that e-mail is different from the source of another e-mail containing a different domain name." (*Kleffman, supra,* 49 Cal.4th at pp. 346–347 & fn. 11.)

■ This case presents a different factual scenario than the one addressed by the Supreme Court in *Kleffman* in three critical respects. First, the trial court in this case did not decide Trancos's use of multiple, random, nonsensical domain names to defeat spam filters or to otherwise create an impression its e-mails were from different senders in and of itself violated section 17529.5(a)(2). Second, the court did not decide the use of a domain name that failed to clearly identify Trancos violated the statute. Third, unlike *Kleffman,* this case did not involve the use of domain names both parties agreed were fully traceable to Trancos. Here, the trial court decided the fact the senders' domain names in seven of the e-mails did not represent a real company *and could not be readily traced back to Trancos, the owner of the domain names and true sender of the e-mails,* constituted falsification or misrepresentation for purposes of the statute. Further, unlike *Kleffman,* the salient motivation for the use of multiple, random domain names here was not to fool spam filters, but to prevent recipients of the e-mails from being able to identify Trancos as their true source. It was undisputed Trancos intentionally used only privately registered, meaningless domain names in order to prevent e-mail recipients from being able to identify it as the sender, or to contact it except by sending a blind reply e-mail to an address the sender would have no way of linking to Trancos. Because the facts here are distinguishable, and the Supreme Court in *Kleffman* expressly disclaimed an intention to determine the full scope of section 17529.5(a)(2), *Kleffman* informs our analysis, but does not dictate its result. (See *Kleffman, supra,* 49 Cal.4th at p. 347, fn. 11.)

■ *Kleffman* states: "An e-mail with an accurate *and traceable* domain name makes no affirmative representation or statement of fact that is false . . . [and] cannot reasonably be understood to be an implied assertion that the source of that e-mail is different from the source of another e-mail containing a different domain name." (*Kleffman, supra,* 49 Cal.4th at p. 347, italics added & omitted.) The importance of being able to trace the owner of a domain name for purposes of evaluating a claim of misrepresented header information was also highlighted in *Gordon.* (See *Gordon, supra,* 575 F.3d at pp. 1063–1064.) *Gordon* addressed whether plaintiff Gordon's claim under a Washington State statute barring commercial e-mails that misrepresent their

point of origin was preempted by the CAN-SPAM Act. (*Gordon*, at pp. 1057–1058.) In the course of holding the claim was preempted, the court found there was nothing "inherently deceptive" in the defendant's use of fanciful domain names based in part on the admitted fact that "a WHOIS search, or a similar reverse-look-up database, accurately identifies [the defendant] as the domain registrant and provides other identifying information." (*Id.* at pp. 1063–1064, fn. omitted.) According to *Gordon*, the use of multiple domain names in those circumstances is not false or deceptive because it does not "impair a recipient's ability to identify, locate, or respond to the person who initiated the e-mail." (*Id.* at p. 1064.) But where, as in this case, the commercial e-mailer intentionally uses privately registered domain names in its headers that neither disclose the true sender's identity on their face nor permit the recipient to readily identify the sender, it is implicit in the reasoning of *Kleffman* and *Gordon* that such header information *is* deceptive and *does* constitute a falsification or misrepresentation of the sender's identity.

The federal CAN-SPAM Act incorporates a similar concept. The act makes it a crime to "materially falsif[y] header information in multiple commercial electronic mail messages." (18 U.S.C. § 1037(a)(3).) The act specifies "header information . . . is materially falsified if it is altered or concealed in a manner that would impair the ability of a recipient of the message [(among others, including law enforcement)] . . . to *identify, locate, or respond to a person who initiated the electronic mail message . . . .*" (18 U.S.C. § 1037(d)(2), italics added; cf. *Omega World Travel, Inc. v. Mummagraphics* (4th Cir. 2006) 469 F.3d 348, 357–358 (*Omega*) [e-mail headers not materially false or misleading where the e-mail is "replete with accurate identifiers of the sender," including its telephone number and mailing address].)

■ Properly construed, *Kleffman* simply held a commercial e-mailer is not misrepresenting its identity when it uses multiple, randomly named, *but accurate and traceable*, domain names in order to avoid spam filters. The plaintiff in *Kleffman* had urged there was a vital distinction for purposes of section 17529.5(a)(2) between a commercial e-mailer who happened to use more than one domain name for mailing purposes and an e-mailer who deliberately used multiple, randomly chosen, nonsensically named domain names in order to create a misleading impression the e-mails were from different sources when they were in fact all from a single source. (*Kleffman, supra*, 49 Cal.4th at pp. 341–342.) The Supreme Court found that distinction immaterial *provided* all of the names used were accurate and traceable to the sender.[11] (*Kleffman*, at pp. 345–347.) We are presented with a different case.

[11] As noted earlier, the plaintiff in *Kleffman* conceded the domain names used in the challenged e-mails "actually exist[ed] and [were] technically accurate, literally correct, and fully traceable to Vonage's marketing agents." (*Kleffman, supra*, 49 Cal.4th at p. 340.) Here,

Here, the domain names were *not* traceable to the actual sender. The header information is "falsified" or "misrepresented" because Trancos deliberately created it to prevent the recipient from identifying who actually sent the message. Thus, the nonsensical domain name "misstepoutcome.com" neither discloses Trancos's name or can it be linked to Trancos using any public database. While, as *Kleffman* states, an e-mail with an accurate *and traceable* domain name makes no affirmative representation or statement of fact that is false, an e-mail with a made-up *and untraceable* domain name affirmatively *and falsely* represents the sender has no connection to Trancos.

██ The *Kleffman* court did not define what it meant by a *traceable* domain name. It did state specifically that the 11 e-mails at issue in that case could all be "traced" to a single physical address in Nevada where Vonage's marketing agent was located. (*Kleffman, supra,* 49 Cal.4th at p. 338.) Although *Gordon* did not use the word "trace" or "traceable," it did place significance on the fact that a WHOIS search or similar database would provide the name, physical address, and other identifying information for the registrant/owner of all of the domain names used in that case. (*Gordon, supra,* 575 F.3d at p. 1064 & fn. 22.) Besides *Kleffman* and *Gordon,* our own research did not disclose any other cases that have used the term or discussed the concept of traceability in this context. The most relevant dictionary definition of the verb "trace" would seem to be "to ascertain by investigation; find out; discover." (Dictionary.com, trace <http://dictionary.reference.com/browse/trace> [as of Feb. 24, 2012].) We have no reason to believe the Supreme Court in *Kleffman* intended a different standard of investigation than that discussed in *Gordon.* If the court meant that a sender was "traceable" if a trained investigator or a determined litigant armed with discovery and subpoena rights could ascertain the sender's identity—as Balsam was required to do to find Trancos—it would have said so with particularity. We read *Kleffman* commonsensically in light of *Gordon* to mean that a domain name is "traceable" to the sender if the recipient of an e-mail could ascertain the sender's identity and physical address through the use of a publicly available database such as WHOIS.

There is good reason to treat a commercial e-mailer's deliberate use of untraceable, privately registered domain names to conceal its identity as a falsification or misrepresentation for purposes of the statute. Judging from Trancos's Meridian business, such e-mailers send out millions of commercial e-mail offers per month. Each such e-mail sent has the potential to cause harm to the recipient, ranging from mere annoyance or offense to more tangible harms such as inducing the recipient to visit Web sites that place

there was no concession the domain names were traceable to Trancos using any publicly available database, and the trial court specifically found they were not traceable. However, it was not disputed that the domain names actually existed and were owned by Trancos. Whether the e-mails were actually sent from the domains listed in their headers is a technical question that was not established one way or the other.

malware or viruses on their computer, defraud them out of money, or facilitate identify theft.[12] Sending millions of such e-mails, as Trancos did, makes harm inevitable. If Trancos deliberately hides its identity from recipients, as it concedes it did, what means of redress does a recipient have? The recipient can send a blind e-mail message or a letter to a nonexistent company at a post office box making a complaint or attempting to opt out of future e-mails, but if Trancos (or an employee who sees the complaint) chooses not to respond or take any action, the recipient is at a dead end.[13] Because Trancos hides its identity behind an impenetrable shield of made-up names, an aggrieved recipient cannot look up public information about Trancos's business, cannot find its Web site, cannot call and speak to a Trancos employee, cannot write to Brian Nelson, cannot report Trancos to the Better Business Bureau or the Attorney General, and cannot warn others about Trancos by writing a letter to a newspaper or posting a complaint on the Internet. Using a privately registered domain name leaves it entirely up to Trancos whether it will or will not respond to or provide redress to persons (other than determined litigants like Balsam) who are harmed, annoyed, or offended by its communications.[14] Trancos does not explain why its business is so sensitive and so different from all other businesses that it must be free to hide its identity from the millions of individuals to whom it directed its commercial solicitations.

If anything, the absence of ordinary marketplace safeguards in commercial e-mailing suggests Trancos should bear some accountability to the recipients of its e-mails. By Trancos's own account, those recipients have not given any direct consent to receive e-mails from Trancos or its advertisers. The consent Trancos claims to have by virtue of recipients assertedly agreeing to receive e-mails from ValueClick and its partners is highly attenuated at best. Not

---

[12] "[Unsolicited commercial e-mail (UCE)] can be difficult if not impossible to identify without opening the message itself. Having to take that extra step can be more than a waste of time and money. Studies indicate that UCE often contains offensive subject matter, is a favored method for pursuing questionable if not fraudulent business schemes, and has been successfully used to spread harmful computer viruses." (*Ferguson v. Friendfinders, Inc.* (2002) 94 Cal.App.4th 1255, 1268 [115 Cal.Rptr.2d 258].)

[13] Federal Trade Commission (FTC) study conducted before enactment of the CANSPAM Act found that most purported "remove me" links and addresses in a sample of 200 unsolicited commercial e-mails were invalid or ineffective. (The Integrity and Accuracy of the "WHOIS" Database, Hearings before the House Com. on Judiciary, Subcom. on Courts, the Inernet, and Intellectual Property, 107th Cong., 2d Sess. (2002), prepared statement of Howard Beales, Dir. of the Bureau of Consumer Protection, FTC [as of Feb. 24, 2012].) Whether warranted or not, there is widespread consumer fear that using unsubscribe links will result in increased spam or other harms. (FTC, Effectiveness and Enforcement of the CAN-SPAM Act: A Rep. to Congress (Dec. 2005) pp. A12–A14 [as of Feb. 24, 2012].)

[14] Before filing suit, Balsam did send a certified, return receipt requested letter to USAProductsOnline.com at The UPS Store address provided in the e-mails, to which Trancos never responded. Nelson did not recall seeing the letter.

being *customers* of Trancos, the recipients have no power to influence how Trancos deals with them by purchasing from someone else. Attempting to unsubscribe is not a practical option when the unwilling recipient has no ability to determine the sender's identity or good faith. In fact, Trancos's financial incentive, and possibly even its agreement with the list owner, is to mail out offers to as many recipients as possible as frequently as possible. Since it does not save Trancos a penny to remove a recipient from its mailing list, it is by definition more expensive for Trancos to *stop* sending e-mails to any given recipient than it is to *keep* sending them. Moreover, recipients have no control over whose advertising messages Trancos is sending into their mailboxes and, with its own identity concealed from potential victims, Trancos has little incentive to make sure it is only advertising legitimate businesses. Allowing commercial e-mailers like Trancos to conceal themselves behind untraceable domain names amplifies the likelihood of Internet fraud and abuse—the very evils for which the Legislature found it necessary to regulate such e-mails when it passed the Anti-spam Law. (See § 17529.)

Trancos relies on a nonpublished United States District Court case, *Asis Internet Services v. Member Source Media, LLC* (N.D.Cal., Apr. 20, 2010, No. C-08-1321 EMC) 2010 WL 1610066 (*Member Source*), to show private registration does not matter under section 17529.5(a)(2). While not binding on us, a nonpublished federal district court case can be citable as persuasive authority. (*Olinick v. BMG Entertainment* (2006) 138 Cal.App.4th 1286, 1301, fn. 11 [42 Cal.Rptr.3d 268].) But we do not find *Member Source* persuasive on the question of traceability because the court does not address the issue. In *Member Source*, a federal magistrate judge found a commercial e-mailer's use of multiple, privately registered domain names in its headers was not false or deceptive, and a section 17529.5 claim based on that conduct was therefore preempted by the CAN-SPAM Act.[15] (*Member Source*, at p. *4.) For that conclusion, *Member Source* relied exclusively on *Gordon*, finding the plaintiff's allegations in *Gordon* and those in the case before it were indistinguishable. (*Member Source*, at p. *4.) *Member Source* made no mention of the plaintiff's concession in *Gordon* that the domain names the sender used were traceable to the sender using a WHOIS search, and did not address the apparent significance this had for the *Gordon* panel.

Trancos argues the subject e-mails *were* traceable to it in any event because each e-mail provided multiple ways to unsubscribe, an e-mail sent to the address on the "From" line would have been received and acted upon by

---

[15] As further discussed *post*, the CAN-SPAM Act includes an express preemption clause preempting any state statute that "regulates the use of electronic mail to send commercial messages, *except* to the extent that any such statute . . . *prohibits falsity or deception* in any portion of a commercial electronic mail message or information attached thereto." (15 U.S.C. § 7707(b)(1), italics added.)

Trancos, and Balsam could have complained to GoDaddy, which would have forwarded his complaint to Trancos.[16] However, the issue before us is not whether the recipient could have communicated its desire to opt out or written a complaint that might have come to Trancos's attention, but whether the "From" line falsified or misrepresented the sender's *identity*. As explained, the significance of being able to readily trace the sender's identity is that it gives the recipient recourse if the sender finds it expedient to ignore the recipient's communication.

██ We therefore hold, consistent with the trial court's ruling, that header information in a commercial e-mail is falsified or misrepresented for purposes of section 17529.5(a)(2) when it uses a sender domain name that *neither* identifies the actual sender on its face *nor* is readily traceable to the sender using a publicly available online database such as WHOIS.[17]

## B. *Federal Preemption*

Trancos contends the federal CAN-SPAM Act preempts application of California's Anti-spam Law in this case because, in its view, the act's express preemption clause exempting state statutes that prohibit falsity or deception in any portion of a commercial e-mail is properly construed to require a state law plaintiff to prove all elements of common law fraud. Since the trial court did not, for example, require Balsam to prove either reliance or actual damages, his claim would be preempted under Trancos's theory.

As Trancos acknowledges, there is a split in the recent decisions addressing the scope of the CAN-SPAM preemption. Some federal cases hold all elements of common law fraud must be established to survive preemption. (See, e.g., *Kleffman v. Vonage Holdings Corp.* (C.D.Cal., May 23, 2007, No. CV 07-2406 GAF(JWJx)) 2007 WL 1518650, p. *3, affd. (9th Cir. 2010) 2010 WL 2782847 [Congress left states room only to extend their traditional fraud prohibitions to the realm of commercial e-mails]; *Asis Internet Services v. Optin Global Inc.* (N.D.Cal., Apr. 29, 2008, No. C-05-05124 JCS) 2008 WL 1902217 [relying on *Kleffman v. Vonage Holdings Corp.*].) Other federal cases have found the scope of the savings clause in the CAN-SPAM Act's preemption provision is broader than common law fraud. (See, e.g., *Asis Internet v. Consumerbargaingiveaways, LLC* (N.D.Cal. 2009) 622 F.Supp.2d

---

[16] Trancos also points out each e-mail included the advertiser's physical address. However, when the sender and advertiser are unrelated entities, including the advertiser's purported address does not affect whether the sender's identity is falsified or misrepresented.

[17] We express no judgment about other circumstances in which (1) header information might be falsified or misrepresented for purposes of the statute or (2) the presence of other information identifying the sender in the body of the e-mail could affect liability under the statute.

935, 941–944 [§ 17529.5, subd. (a) claim not preempted even though plaintiffs could not prove reliance or damages, since " 'falsity or deception' " is not confined to strict common law fraud]; *Asis Internet Services v. Vistaprint USA, Inc.* (N.D.Cal. 2009) 617 F.Supp.2d 989, 992–994 [same]; see also *Asis Internet Services v. Subscriberbase Inc.* (N.D.Cal., Apr. 1, 2010, No. 09-3503 SC) 2010 WL 1267763, pp. *9–*13 [" 'falsity or deception' " exemption does not require proof of reliance or damages].)

The application of CAN-SPAM's preemption and savings clauses to claims under section 17529.5 was recently analyzed in depth by a Second District panel in *Hypertouch, supra,* 192 Cal.App.4th 805, 818–833. The plaintiff's underlying claims in *Hypertouch* included, among others, that the "From" field in commercial e-mails sent out by third parties to drive traffic to ValueClick's Web sites violated section 17529.5(a)(2) by failing to accurately reflect the identity of the sender. (*Hypertouch,* at pp. 815–816.) ValueClick moved for summary judgment in part on the grounds the CAN-SPAM Act's exemption for state statutes prohibiting "falsity or deception" was only intended to permit state law claims based on all elements of common law fraud. Since the plaintiff had no evidence ValueClick knew about the e-mails or any recipients relied on or were harmed by their deceptive content, the plaintiff's claims were preempted. (*Hypertouch,* at p. 816.)

*Hypertouch* rejected ValueClick's argument, holding instead "the CAN-SPAM Act's savings clause applies to any state law that prohibits material falsity or material deception in a commercial e-mail regardless of whether such laws require the plaintiff to prove and plead each and every element of common law fraud." (*Hypertouch, supra,* 192 Cal.App.4th at p. 833.) The CAN-SPAM Act therefore did not preempt the plaintiff's state statutory claims, the court reasoned, even though section 17529.5 does not require proof of three elements of common law fraud—scienter, reliance, and damages. (*Hypertouch,* at pp. 820–823, 826–830, 833.) The court considered the text, legislative history, and purpose of the preemption and savings clauses at issue, concluding that Congress must have intended the phrase "falsity or deception" to encompass fraudulent or deceptive conduct that would not satisfy all elements of common law fraud. (*Id.* at pp. 826–830.) We find the reasoning of *Hypertouch* persuasive on this issue, and adopt it here.

*Hypertouch* rejected the view—also pressed by Trancos in this case—that the Fourth and Ninth Circuits in *Omega* and *Gordon,* respectively, took a more restrictive view of the CAN-SPAM Act's savings clause. (*Hypertouch, supra,* 192 Cal.App.4th at pp. 831–833.) Although there is dicta in *Omega* that arguably goes further, we agree with *Hypertouch* that these cases merely decided "falsity or deception" connotes an element of tortiousness or wrongfulness and, therefore, state law claims based on no more than

*immaterial* or *nondeceptive* inaccuracies or omissions in commercial e-mails are preempted. (See *Hypertouch*, at pp. 831–833; *Omega, supra*, 469 F.3d at pp. 353–354; *Gordon, supra*, 575 F.3d at pp. 1063–1064.) In this case, Trancos's deliberate use of randomly chosen, untraceable domain names on the "From" line of the subject e-mails for the stated purpose of concealing its role in sending them does involve deception as to a material matter—the sender's identity—as well as an element of wrongful conduct. Trancos makes no argument to the contrary.

Accordingly, we will affirm the award of liquidated damages to Balsam. The award is neither inconsistent with the statute as construed in *Kleffman* nor preempted by federal law. We turn now to the attorney fee award and Balsam's cross-appeal.

C. *Attorney Fees*

Trancos argues the trial court abused its discretion in awarding Balsam $81,900 in attorney fees because Balsam's fee motion was unsupported by proper documentation, including proper bills, an unambiguous statement of the hourly rate charged by Balsam's counsel, or complete, comprehensible timesheets. Trancos also claims the case could and should have been brought in small claims court without expenditure of attorney fees.

A trial court is vested with wide discretion in fixing the amount to be awarded to a prevailing party for attorney fees, and a court's award will not be disturbed on appeal unless the record discloses an abuse of discretion. (*Rogel v. Lynwood Redevelopment Agency* (2011) 194 Cal.App.4th 1319, 1321 [125 Cal.Rptr.3d 267].) "The 'experienced trial judge is the best judge of the value of professional services rendered in [her] court, and while [her] judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong.' " (*Serrano v. Priest* (1977) 20 Cal.3d 25, 49 [141 Cal.Rptr. 315, 569 P.2d 1303], quoting *Harrison v. Bloomfield Building Industries, Inc.* (6th Cir. 1970) 435 F.2d 1192, 1196.) Detailed timesheets are not necessarily required to support fee awards. (*Margolin v. Regional Planning Com.* (1982) 134 Cal.App.3d 999, 1006–1007 [185 Cal.Rptr. 145].)

We have reviewed the handwritten timesheets of Counsel Timothy Walton supporting Balsam's motion which were submitted to the trial court on CD-ROM. Contrary to Trancos's representations, the timesheets are not illegible or incomprehensible. Each daily timesheet was contemporaneously prepared, and specifies the client's name, the matter worked on, the task performed, and the time spent on the task. Only days on which Walton worked on the Trancos case are included, and each day includes no more than

a handful of different entries. The handwriting is perfectly legible, and the abbreviations used are easily understood (e.g., "TC" for telephone conference, "RF" for review file, etc.). While not as detailed as some attorney time-keeping records, Walton's timesheets were adequate. An accompanying declaration by him adds up the hours spent on this case, broken down by quarter and type of task performed. If Trancos felt Walton's summary was inaccurate or misleading, the raw data used was available to it to analyze in a different format.

We do not find the hours recorded by Walton—a total of 166.9 over a nearly three-year period, including time spent on a five-day court trial and its aftermath—were unusual or unreasonable for a case of this difficulty and complexity. In fact, Walton's time spent on the case was undoubtedly reduced because Balsam, a licensed attorney with considerable expertise in the subject matter of the lawsuit, devoted a substantial amount of his own, uncompensated time to the case. According to Balsam, this included most of the time spent on issues in which he did not prevail, such as his CLRA claim and Nelson's joint and several liability. Balsam was also billed for 86 hours of paralegal time he was unable to recover because the paralegals did not meet all requirements of section 6450. The trial court reduced Walton's time by 10.9 hours to reflect time spent on a defective motion for summary judgment and denied Balsam's request for a multiplier. We cannot say the trial court abused its discretion by awarding Balsam compensation based on 156 hours of attorney time spent on the case. We also find no fatal ambiguity in Walton's declaration. He states his customary and usual hourly rate was $400, and that Balsam was billed for his time and paid all amounts billed. Trancos makes no argument Walton's hourly rate was excessive. We find no abuse of discretion in the trial court's award of $62,400 for Walton's time.

Trancos also objects to the trial court's award to Balsam of 75.5 hours at $250 per hour for Walton's second chair at trial, Jim Twu. Twu's resume showed he had extensive pretrial civil litigation experience after graduating from law school in 1994. Walton stated Twu assisted with trial preparation and maintained the organization of the files, exhibits, and evidence at trial. As the trial court impliedly found, an hourly rate of $250 for a litigation attorney with Twu's experience is not excessive. Having presided at the trial, the trial judge was in the best position to evaluate whether this portion of the fee claim was reasonable. Trancos fails to establish the court abused its discretion.

Trancos questions whether it was necessary for Balsam to incur the fees he did since the $7,000 awarded could have been obtained in small claims court or in a limited civil case, and Trancos had already shut down its Meridian operation in 2007. Trancos ignores the fact Balsam originally sought liquidated damages of $8,000 for eight e-mails, an amount exceeding the then

applicable small claims maximum of $7,500. (Code Civ. Proc., former § 116.221.) He also sought permanent injunctive relief in connection with his CLRA cause of action, which is beyond the scope of a limited civil case. (Code Civ. Proc., § 580, subd. (b)(2).) Trancos did not establish Balsam knew it was out of the list management business when he filed suit, or that its voluntary abandonment of the business would have affected his right to pursue monetary or even injunctive relief against it. In any event, as Trancos conceded in the trial court, it was within the court's discretion whether to award fees notwithstanding that Balsam's ultimate recovery could have been rendered in a limited civil case. (Code Civ. Proc., § 1033, subd. (a).)

Finally, Trancos argues the court acted arbitrarily and capriciously because it failed to explain the reasons for the award. No statement of reasons was required. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140 [104 Cal.Rptr.2d 377, 17 P.3d 735].) The record reflects the trial court did not merely "rubberstamp" Balsam's fee request. It required him to submit additional documentation after the original motion was filed, and invited additional briefing. The court's comments at the two hearings it held on the motion showed it had read the parties' extensive submissions and was fully conversant with their positions and documentation. At the second hearing, the court responded directly to Trancos's objections as they were raised. In the end, the court accepted some of Trancos's arguments and awarded Balsam substantially less than he had originally requested. We find no basis in the record to conclude the court acted arbitrarily or capriciously in failing to make greater reductions.

Accordingly, we affirm the trial court's order awarding fees.

D. *Balsam's Cross-appeal*

1. *Balsam's CLRA Standing*

The trial court held Balsam lacked standing to sue under the CLRA because he (1) was not a "consumer" of any goods or services as defined in Civil Code section 1761, subdivision (d) and (2) did not sustain "any damage[s]" caused by defendants' conduct as required by Civil Code section 1780. Balsam disputes both conclusions.

The CLRA provides: "*Any consumer who suffers any damage* as a result of the use . . . of a method, act, or practice declared to be unlawful by [Civil Code] Section 1770 may bring an action against that person to recover or obtain" specified relief including actual damages and an injunction against the unlawful method, act, or practice. (Civ. Code, § 1780, subd. (a), italics added.) Civil Code section 1770, subdivision (a), part of the CLRA, lists

some 24 proscribed acts or practices, such as passing off goods and services as those of another, disparaging the business of another by false or misleading representations of fact, and inserting unconscionable provisions in a contract. A "consumer" is defined in Civil Code section 1761, subdivision (d), part of the CLRA, as "an individual who *seeks or acquires*, by purchase or lease, any goods or services for personal, family, or household purposes." (Italics added.)

Here, Balsam freely acknowledges he did not seek or acquire any of the goods or services advertised in Trancos's e-mails. Balsam testified the e-mails were entirely unsolicited and he would never on principle buy anything advertised in what he considered to be spam e-mail. He stated he clicked on the links in some of Trancos's e-mails to see where they would take him, but with no intention of buying anything. Based on the plain text of Civil Code section 1761, it is difficult to see how Balsam could have been a "consumer" for purposes of the CLRA.

Balsam focuses on the word "any" in Civil Code section 1761, arguing if the Legislature intended to limit standing only to persons who sought or acquired the particular product or service being falsely advertised, it would have chosen its words differently. According to Balsam, the "consumer" definition was merely intended to distinguish consumers from nonconsumers, such as businesses or governmental entities, by specifying consumers can bring CLRA actions, but businesses and governmental entities cannot. Balsam does not explain why the Legislature would have chosen such a roundabout way of specifying only individuals could sue under the CLRA. His interpretation would also render nugatory the words "by purchase or lease" in the definition.

The one case Balsam cites in support of his construction, *Nordberg v. Trilegiant Corp.* (N.D.Cal. 2006) 445 F.Supp.2d 1082 (*Nordberg*), merely held plaintiffs who were charged for products they did not seek or want nonetheless met the CLRA definition of "consumer" because the verb "acquire" in the definition did not require any conscious action or desire on the plaintiffs' part. (*Nordberg*, at pp. 1087–1088, 1095–1096.) *Nordberg* did not adopt anything resembling the sweeping "consumer" definition Balsam urges upon this court. Under *Nordberg*'s interpretation, Balsam would not in fact be a consumer since he neither sought *nor* acquired any good or service connected to Trancos or its advertisers. *Nordberg* thus undermines rather than supports Balsam's position.

In *Schauer v. Mandarin Gems of Cal., Inc.* (2005) 125 Cal.App.4th 949 [23 Cal.Rptr.3d 233] (*Schauer*), the court held a woman suing a jeweler who had sold her former husband an engagement ring based on a fraudulent appraisal

was not a "consumer" for purposes of the CLRA: "Unfortunately for plaintiff, by statutory definition [plaintiff's former husband] was the consumer because it was he who purchased the ring. [Citation.] [Fn. omitted.] Plaintiff's ownership of the ring was *not acquired as a result of her own consumer transaction with defendant*, and . . . she [therefore] does not fall within the parameters of consumer remedies under the Act." (*Schauer*, at p. 960, italics added.) *Schauer* thus also takes a view of the statute inconsistent with Balsam's.

In a case directly on point, a federal district court judge specifically rejected Balsam's view of the CLRA, holding a recipient of spam e-mail from Vonage was not a "consumer" under the CLRA because he specifically alleged he had not sought or acquired any products or services offered by Vonage. (*Kleffman v. Vonage Holdings Corp., supra*, 2007 WL 1518650 at p. *4.) Citing *Schauer*, the court stated: "It is not enough that the plaintiff is a consumer of just *any* goods or services; rather, the plaintiff must have acquired or attempted to acquire the goods or services in the transaction at issue." (*Kleffman v. Vonage Holdings Corp.*, at p. *4.)

We agree with *Schauer* and reject Balsam's proposed definition of "consumer." *Schauer's* holding is reinforced by the requirement the plaintiff suffer damage as a result of the method, act, or practice alleged to be unlawful. A person who did not seek, purchase, or lease any product or service from a defendant, either directly or indirectly, would seemingly be in no position to allege damage as a result of the defendant's unlawful practice. Balsam tries to thread that needle by arguing the phrase "any damage" in Civil Code section 1780, subdivision (a) is much broader than just pecuniary damages and can apparently include even mere annoyance and loss of time. He cites certain legislative findings and declarations contained in section 17529, part of the Anti-spam Law, to show that all recipients of spam e-mails are damaged in various ways including the passed-through costs of spam filtering technologies, the consumption of valuable data storage space, and annoyance and loss of time. (§ 17529, subds. (d), (e), (g), (h).) Balsam then applies the simple syllogism that since the Legislature found all recipients of e-mail spam are damaged, and he was a recipient, it must follow he suffered damage.

There are two problems with Balsam's argument. First, the harms Balsam claimed he automatically suffered as a result of being a recipient of spam are not the *result* of any method, act, or practice allegedly made unlawful by Civil Code section 1770, as the CLRA standing provision requires. Balsam alleged the subject e-mails violated various provisions of Civil Code section 1770, subdivision (a) by misrepresenting their source and containing other false or deceptive representations. To support his CLRA cause of action, Balsam was required to prove "not only that [the] defendant's conduct was deceptive *but that the deception caused* [*him*] *harm*."

(*Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282, 1292 [119 Cal.Rptr.2d 190], italics added.) The harms cited by the Legislature when it passed the Anti-spam Law do not satisfy that burden of proof. Those harms do not stem from the *deceptive content* of individual spam e-mails, but from the *excessive volume* of e-mail that spammers *collectively* send out over the Internet. Balsam's theory of how he was damaged, if accepted by the trial court, would have made it impossible for him to prove his damages were caused by Trancos's deceptive conduct under the CLRA. (See *Buckland v. Threshold Enterprises, Ltd.* (2007) 155 Cal.App.4th 798, 809–810 [66 Cal.Rptr.3d 543], disapproved on other grounds in *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 337 [120 Cal.Rptr.3d 741, 246 P.3d 877] [plaintiff's lack of actual reliance on defendant's deceptive packaging and advertising defeated her CLRA claim].)

This points to a second, related problem with Balsam's logic. In section 17529, the Legislature was addressing problems caused by the *collective* conduct of *many* spammers which taxes Internet resources and clogs individual in-boxes. These asserted harms are not the result of the conduct of any one commercial e-mailer, including Trancos. Balsam engages in a fallacy of division[18] when he tries to bootstrap legislative findings about the aggregate effects of abusive commercial e-mailing practices in general into an argument he personally must have suffered some unspecified damage as a result of the eight e-mails he received from Trancos.

 Balsam maintains he was not required to prove reliance or causation because he was seeking only injunctive, not monetary, relief under the CLRA. He supports that proposition with a passage from *Annunziato v. eMachines, Inc.* (C.D.Cal. 2005) 402 F.Supp.2d 1133, in which the court states there is no need to prove reliance or causation when the plaintiff is seeking an injunction to protect the public. (See *id.* at p. 1137.) But *Annunziato* involved no claims brought under the CLRA. (*Annunziato*, at p. 1136.) In the passage Balsam cites, *Annunziato* was concerned only with claims under the unfair competition law (§ 17200 et seq.) and the false advertising law (§ 17500 et seq.), and was in fact distinguishing these laws from the CLRA, which does require proof of causation and damages. (*Annunziato*, at p. 1137.) By its own terms, section 1780, subdivision (a), part of the CLRA, requires a consumer sustain damages as a result of conduct made unlawful by Civil Code section 1770 in order to obtain *any* relief, whether monetary or injunctive. Balsam fails to prove the statute means something different from what it says.

---

[18] "The 'fallacy of division' is the reverse of the fallacy of composition. It is committed when one argues that what is true of a whole must also be true of its parts." (*Rosen v. Unilever U.S., Inc.* (N.D.Cal., May 3, 2010, No. C 09-02563 JW) 2010 WL 4807100, pp. *5–*6.)

The trial court properly dismissed Balsam's CLRA cause of action.

### 2. *Nelson's Liability Under the Anti-spam Law*

The trial court found Nelson had no individual liability to Balsam because Nelson "was acting at all relevant times as an officer and employee of Defendant Trancos Inc. in regard to the subject transactions . . . ." Balsam disagrees, contending even if Nelson was acting within the course and scope of his duties, he personally participated in, authorized, and set in motion the actions taken by Trancos that violated the Anti-spam Law. In particular, Balsam points to evidence Nelson personally registered some of the domain names Trancos used for its Meridian operation, allowed his credit card to be used to pay for registration of the USAProductsOnline.com domain name, and agreed with and ratified independent contractor Costeli's recommendation the domain names used in the Meridian operation be privately registered. Balsam also cites to Nelson's testimony he was sure he must have been asked to make decisions concerning the Meridian business, but could not recall the specifics.

The relevant legal principles are reviewed in *PMC, Inc. v. Kadisha* (2000) 78 Cal.App.4th 1368, 1378–1389 [93 Cal.Rptr.2d 663] (*PMC*). "Corporate director or officer status neither immunizes a person from personal liability for tortious conduct nor subjects him or her to vicarious liability for such acts. [Citations.] . . . 'Directors or officers of a corporation do not incur personal liability for torts of the corporation merely by reason of their official position, unless they participate in the wrong or authorize or direct that it be done. They may be liable, under the rules of tort and agency, for tortious acts committed on behalf of the corporation. [Citations.]' . . . '. . . "[A]n officer or director will not be liable for torts in which he does not personally participate, of which he has no knowledge, or to which he has not consented. . . . While the corporation itself may be liable for such acts, the individual officer or director will be immune unless he authorizes, directs, or in some meaningful sense actively participates in the wrongful conduct." ' " (*Id.* at p. 1379.)

"A corporate director or officer's participation in tortious conduct may be shown not solely by direct action but also by *knowing consent to or approval of unlawful acts*." (*PMC, supra,* 78 Cal.App.4th at p. 1380, italics added.) "[T]he rule imposing liability on an officer or director for participation in or authorization of tortious conduct has its roots in agency law. [Citations.] . . . Civil Code section 2343 provides: 'One who assumes to act as an agent is responsible to third persons as a principal for his acts in the course of his agency, in any of the following cases, and in no others: [¶] . . . [¶] 3. *When his acts are wrongful in their nature.*' This rule applies to officers and directors." (*Id.* at p. 1381, italics added; see also *McClory v.*

*Dodge* (1931) 117 Cal.App. 148, 152–154 [4 P.2d 223], disapproved on other grounds in *Mary Pickford Co. v. Bayly Bros., Inc.* (1939) 12 Cal.2d 501, 522 [86 P.2d 102] [corporate directors personally liable for misappropriation of plaintiff's stock when they knew or should have known conduct was wrongful].) An officer or director who commits a tort in reasonable reliance on expert advice or other information cannot be held personally liable for the resulting harm. (*PMC*, at pp. 1386–1387.)

The evidence in this case did not warrant imposition of personal liability on Nelson. When he was asked what his involvement was in Meridian, Nelson responded: "I paid Joe [Costeli] his monthly consulting fees. Of course, I paid Garrett [Hunter, a Trancos vice-president in charge of Meridian], touched base with Garrett on occasion on this. Again, he was working out of our Pacific Palisades office. I would come down every three weeks to say hi to them. That's it. I mean I signed . . . off on the checks and release[d] payments to our advertisers and publishers." He further testified Costeli and Hunter usually did not ask him to make decisions about the operation, and although he was sure one of them must have asked him to make a decision on *some* aspect of the project, he could not remember any specifics. Nelson let Hunter use his credit card to register the USAProductsOnline.com domain name used in the mailings and he registered some of the domain names himself. Costeli told him it would be a good idea to privately register the domain names used in the operation, and Nelson agreed to it because of issues Trancos had had in the past, including being "mail bombed" by one person, and employees receiving threatening telephone calls.

Nelson had minimal involvement with Meridian's operations. He did not participate in most of its decisions. There is no evidence he *knowingly* consented to or approved of any unlawful acts on its part. The legal violation that did occur—sending out e-mails using domain names on the "From" line that were untraceable to the sender—stemmed from a consultant's recommendation on which Nelson reasonably relied for reasons unrelated to the Anti-spam Law. There is no evidence Nelson knew or should have known using privately registered, untraceable domain names would violate the law or was otherwise tortious or wrongful. Doing so was not "wrongful in [its] nature." (Civ. Code, § 2343, subd. 3.)

Balsam cites no case remotely similar, and we have found none, in which personal liability was imposed on a corporate officer. *People v. Conway* (1974) 42 Cal.App.3d 875 [117 Cal.Rptr. 251] (*Conway*), cited by Balsam, is distinguishable. In *Conway*, the president of an auto dealership was held personally liable for the unlawful activities of his salesmen where the evidence showed that he controlled the business and "permitted the unlawful practices to continue after being informed of them on numerous occasions."

(*Id.* at p. 886.)[19] There is no evidence Nelson was informed in 2007 that using untraceable domain names on the "From" line of Meridian's e-mails violated the Anti-spam Law, yet allowed the practice to continue.

The trial court properly declined to hold Nelson jointly and severally liable with Trancos.

## III. DISPOSITION

The judgment is affirmed. Balsam shall recover his costs on Trancos's appeal. Trancos and Nelson shall recover their costs on Balsam's cross-appeal.

Marchiano, P. J., and Banke, J., concurred.

A petition for a rehearing was denied March 21, 2012, and the opinion was modified to read as printed above. The petition of defendants and appellants for review by the Supreme Court was denied May 23, 2012, S201366.

---

[19] The relevant facts in *Conway* were as follows: "After being informed of the practices of his subordinates by Mr. Elmer Kunkle, special investigator for the Department of Motor Vehicles, and by Ms. Elizabeth Steidel, [Conway] allowed these subordinates to continue in their positions and carry on their unlawful practices for the benefit of Pasadena Motors. The evidence shows a repeated pattern of illegal conduct by the agents of Pasadena Motors which indicates inferentially [Conway's] toleration, ratification, or authorization of their illegal actions." (*Conway, supra,* 42 Cal.App.3d at p. 886.)